# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------x

AJUDU ISMAILA ADAMU,                          :

                              Plaintiff,      :          No. 02 CV 2104 (GLG)

v.                                            :

PFIZER INC.,                                  :

                              Defendant.      :          October 24, 2003

---------------------------------------------x

## MOTION FOR TRANSFER OF VENUE

Pursuant to 28 U.S.C. § 1404(a), defendant Pfizer Inc. ("Pfizer") hereby moves that venue be transferred to the Southern District of New York. In support of this Motion, Pfizer submits the Affirmation of James D. Herschlein, attached at Tab 1. The grounds for the motion are more fully set forth in the accompanying Memorandum of Law.

                              By:  _____
                                   James D. Herschlein (ct24326)

                                   Steven Glickstein (ct15725)
                                   James Herschlein (ct24326)
                                   Kaye Scholer LLP
                                   425 Park Avenue
                                   New York, New York 10022-3598
                                   (212) 836-8000

                                   *Attorneys for Defendant Pfizer Inc.*

*Of Counsel:*

Edward Scofield
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
(203) 333-9441
Fax: (203) 333-1489
e-mail: escofield@znclaw.com

30742033.WPD

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------x

AJUDU ISMAILA ADAMU,              :

                       Plaintiff,    :      No. 02 CV 2104 (GLG)

                               :

v.                                 :

                               :

PFIZER INC.,                   :

                               :

                    Defendant.    :      October 24, 2003

                               :

---------------------------------------------------------------x

## AFFIRMATION OF JAMES D. HERSCHLEIN IN SUPPORT OF MOTION TO TRANSFER PROCEEDING UNDER 1404(a)

I, James D. Herschlein, affirm that:

1.      I am familiar with the facts contained in this affirmation of my own personal knowledge and, if called to do so, would testify competently to them.

2.      I am an attorney licensed to practice law in the State of New York, and am a partner of the law firm of Kaye Scholer LLP, counsel to defendant Pfizer Inc. in this action. I submit this affidavit in support of Pfizer's motion to transfer this proceeding to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

3.      In August 2001, 52 Nigerian plaintiffs filed *Abdullahi v. Pfizer Inc.*, No. 01-8818 (S.D.N.Y.) ("*Abdullahi*") in the Southern District of New York, claiming to be (or to be the parents/guardians of) thirty of the approximately 200 Nigerians who participated in an antibiotic treatment program sponsored by Pfizer in 1996 at the Kano Infectious Disease Hospital in Kano, Nigeria during a severe outbreak of epidemic meningitis (the "Kano treatment program"). The *Abdullahi* Complaint is attached as Exhibit A.

4.      In November, 2002 – a year and three months after the filing of *Abdullahi*

– this action was commenced by 76 Nigerian plaintiffs who claim to be (or to be the

parents/guardians of) 55 of the approximately 200 Nigerians who participated in the same Kano

treatment program in Nigeria.

5.      As plaintiff's Complaint alleges (paragraph 1), Pfizer's corporate

headquarters are located at 235 East 42nd Street, New York, NY 10022.

6.      Attached as Exhibit B is Judge Pauley's September 17, 2002 decision in

*Abdullahi*.  Attached as Exhibit C is the Second Circuit's October 8, 2003 decision in *Abdullahi*,

where the Court remanded for consideration of two narrow issues:  (1) "what precipitated the

dismissal in *Zango*" – a related action in Nigeria that is allegedly the predecessor action to this

(*Adamu*) case – "to evaluate whether that impacts the District Court's *forum non conveniens*

analysis"; and (2) to address "whether the conduct alleged qualifies as a violation of 'customary

international law' under the [ATS]" in light of the Second Circuit's recent decision in *Flores v.*

*Southern Peru Copper Corp.*, 343 F.3d 140 (2d Cir. 2003).

7.  .   If this case is transferred, but *forum non conveniens* is denied so that the

case proceeds in New York, Pfizer will produce for trial in the Southern District of New York

any current employee who could have been subpoenaed for trial in this district.

8.      I am not aware of any former Pfizer employee who participated in the

Kano, Nigeria treatment program who is subject to process in the District of Connecticut but is

not subject to process in the Southern District of New York.

9.      Juan Walterspiel, a former Pfizer employee who is referenced in the

Complaint, is now a resident of Atlanta, Georgia, as indicated by a subpoena issued in *Abdullahi*

(attached as Exhibit D).  Thus, he is beyond the compulsory process of both New York and

Connecticut.

        I affirm under penalty of perjury that the foregoing is true and correct.

                                      James D. Herschlein

Dated:  October 24, 2003
       New York, New York

Judge Pauley

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

01 CV 8118

------------------------------------------------------------x

Rabi Abdullahi, individually and as the natural guardian
and personal representative of the estate of her daughter
Lubabatu Abdullahi; Salisu Abullahi, individually and
as the natural guardian and personal representative of the
estate of his son Abdullahi (Manufi) Salisu; Abdullahi
Alasan, individually and as the natural guardian and
personal representative of the estate of his daughter
Firdausi Abdullahi; Ali Hashimu, individually and as the
natural guardian and personal representative of the estate
of his daughter Suleiman Ali; Muhammadu Inuwa,
individually and as the natural guardian and personal
representative of the estate of his son Abdullahi M.
Inuwa; Magaji Alh Ladan, individually and as the natural
guardian and personal representative of the estate of his
son Kabiru Isyaku; Alhaji Mustapha, individually and as
the natural guardian and personal representative of the
estate of his daughter Asma'u Mustapha; Suleiman Umar,
individually and as the natural guardian and personal
representative of the estate of his son Buhari Suleiman;
Zainab Abdu, a minor, by her mother and natural guardian,
Hajia Abdullahi, and Hajia Abdullahi individually;
Firdausi Abdullahi, a minor, by her father and natural
guardian, Abdullahi Madawaki, and Abdullahi Madawaki
individually; Sani Abdullahi, a minor, by his father
and natural guardian, Abdullahi Madawaki, and
Abdullahi Madawaki individually; Abdullahi Ado,
a minor, by his mother and natural guardian, Aisha Ado,
and Aisha Ado individually; Abdulmajid Ali, a minor, by
his father and natural guardian, Alhaji Yusuf Ali, and
Alhaji Yusuf Ali individually; Nura Muhammad Ali,
a minor, by his father and natural guardian, Muhammad
Ali, and Muhammad Ali individually; Umar Badamasi,
a minor, by his father and natural guardian, Malam
Badamasi Zubairu, and Malam Badamasi Zubairu
individually; Muhammadu Fatahu Danladi, a minor,
by his father and natural guardian, Alhaji Danaldi Ibrahim,
and Alhaji Danaldi Ibrahim individually; Dalha
Hamza, a minor, by his father and natural

guardian, Malam Hamza Gwammaja, and
Malam Hamza Gwammaja individually; Tasiu Haruna,
a minor, by his guardian Mukhtar Saleh, and Mukhtar
Saleh individually; Muhyiddeen Hassan, a minor, by his
father and natural guardian, Tijjani Hassan, and Tijjani
Hassan individually; Kawu Adamu Ibrahim, a minor, by
his father and natural guardian, Malam Abamus Ibrahim
Adamu, and Malam Abamus Ibrahim Adamu individually;
Sunusi Alh Ibrahim, a minor, by his father and natural
guardian, Alhaji Ibrahim Haruna, and Alhaji Ibrahim
Haruna individually; Maryam Idris, a minor, by her father
and natural guardian, Malam Idris, and Malam Idris
individually; Yusif Idris, a minor, by his father and
natural guardian, Idris Umar, and Idris Umar individually;
Hafsat Isa, a minor, by her father and natural guardian, Isa
Muhammed Isa, and Isa Muhammed Isa individually;
Taju Isa, a minor, by his father and natural guardian,
Malam Isa Usman, and Malam Isa Usman individually;
Hadiza Isyaku, a minor, by her father and natural
guardian, Isyaku Shuaibu, and Isyaku Shuaibu individually;
Zahra'u Jafaru, a minor, by her father and natural guardian,
Jafaru Baba, and Jafaru Baba individually; Anas
Mohammed, a minor, by his father and natural guardian,
Malam Mohammed, and Malam Mohammed individually;
Nafisatu Muhammed, a minor, by her mother and
natural guardian, Yahawasu Muhammed, and Yahawasu
Muhammed individually; and Muhsinu Tijjani, a minor,
by his father and natural guardian, Tijjani Hassan, and
Tijjani  Hassan individually,

Plaintiffs,

v.

Pfizer, Inc.

Defendant.

Civil Action No. _____

**COMPLAINT
AND  JURY TRIAL DEMAND**

------------------------------------------------------------------x

    Plaintiffs, by their attorneys, make the following allegations based upon information

and belief pursuant to the investigation of counsel, except as to allegations specifically pertaining

to themselves and their counsel, which are based on personal knowledge.

## I.    SUMMARY OF ACTION

1.    The minor plaintiffs in this action were the unwitting subjects of an experimental drug test conducted by Pfizer, Inc. ("Pfizer" or the "Company") in Kano, Nigeria. Pfizer never obtained informed consent from the minor plaintiffs or their parents. This test was conducted in violation of international laws and treaties, including the Nuremberg Code of 1947, which was enacted, in part, to prevent the horrors of medical experimentation performed during the Holocaust from ever happening again. The injuries suffered by the minor plaintiffs as a result of Pfizer's secret testing include, among other things, brain damage, loss of hearing, full loss of motor skills, and in some cases, the death of the children involved. Significantly, these children could have received an effective and proven alternative medication that was available and being dispensed to other sick children not chosen for Pfizer's test.

2.    The genesis of the injuries and death that are the subject of the present action is defendant Pfizer's eagerness to benefit from an epidemic of bacterial meningitis in Nigeria. In the midst of the outbreak, Pfizer chartered a DC-9 airplane, and flew to Nigeria to conduct experiments on children who were in desperate need of medical care. Rather than provide the children with a safe, effective and proven therapy for bacterial meningitis, Pfizer chose to select children to participate in a medical experiment of a new, untested and unproven drug without first obtaining their informed consent, or explaining to the children or their parents that the proposed treatment was experimental, and that they were free to refuse it and instead choose the safe, effective treatment for bacterial meningitis being offered at the same site, free of charge, by a charitable medical group.

3.    After the children were selected, they were taken from their parents and split into two groups. One half of the children selected were given Trovafloxacin Mesylate (which Pfizer branded

- 2 -

"Trovan") -- an unproven drug to treat bacterial meningitis, in a form never before tested on humans, for which the Company had completed insufficient animal testing, and which was known to have life-threatening side effects. The other half were purposefully "low-dosed" with an improperly administered control, ceftriaxone. The purposeful low dosing resulted in injuries and deaths among the control group as well, and therefore aided Pfizer in its claim that Trovan was efficacious, and perhaps more efficacious, than the other drugs on the market. In other clinical trials, Pfizer had been cited for "low-dosing" control drugs. Here, Pfizer's actions endangered and damaged these children's lives as the improper administration and dosage of ceftriaxone caused clinical failure, injuries and/or death.

4.      Defendant Pfizer is the world's largest pharmaceutical company and a self-proclaimed "global leader in healthcare," which uses the advertising slogan "Committed to Kids" and states on its web site that "At Pfizer, we recognize that the first years of life are especially precious." The facts concerning Pfizer's conduct in the Kano drug experiment stand in stark contrast to that advertising campaign.

5.      When Pfizer went to Kano to carry out the experiment (hereinafter the "Kano Trovan Test"), this impoverished and strife-torn city in Northern Nigeria was experiencing concurrent epidemics of bacterial meningitis, measles, and cholera. But rather than making the trip to provide humanitarian relief, as charitable organizations were doing, Pfizer hurried to Kano to exploit the misfortune there for its own benefit, and in fact undermined the highly successful humanitarian efforts being taken by others, including Medecins Sans Frontieres ("MSF"), the Nobel Prize-winning humanitarian relief organization also known as Doctors Without Borders.

- 3 -

6.    Pfizer took the opportunity presented by the chaos caused by the civil and medical crises in Kano to accomplish what the Company could not do elsewhere -- to quickly conduct on young children a test of the potentially dangerous antibiotic Trovan. As a result, numerous children were prevented from receiving adequate medical care, and were injured, maimed or died.

7.    Pfizer expected to realize substantial financial benefits for itself from the trial. If Pfizer obtained FDA approval for Trovan's use for pediatric victims of bacterial meningitis, American pediatricians would be free to prescribe the drug for any use, opening up a lucrative market for the Company. Further, if Pfizer was able to secure broad FDA approval for Trovan, the Company could generate billions of dollars in corporate revenue.

8.    Pfizer hastily cobbled together a protocol in a period of mere weeks. Then, in March of 1996, a Pfizer research team installed itself for a month-long stay at Kano's Infectious Disease Hospital. There, the Company's representatives selected children it deemed suitable for its test from the long lines of ailing people seeking care at this unsanitary and rudimentary hospital.

9.    In its zeal to carry out its risky test, Pfizer took a variety of steps which violated international law, federal regulations and principles of medical ethics. Indeed, years later, Pfizer fraudulently back-dated necessary approvals in an attempt to at least partially cover its tracks.

10.    Foremost among Pfizer's violations was its failure to get any consent, informed or otherwise, before performing medical experiments on the subject children, in contravention of customary international law and as specifically forbidden by the Nuremberg Code, the Declaration of Helsinki, and the International Covenant on Civil and Political Rights (the "ICCPR"). In fact, the families involved understood that Pfizer was providing their children with volunteer relief, not that their children were "being volunteered" to help Pfizer.

- 4 -

11.    Pfizer further violated customary international law by failing to inform the families that there was an alternative to the "treatment" being provided by Pfizer. Specifically, MSF had set up a tent on the IDH grounds where a team of its medical personnel with training and experience in epidemic relief work was treating its pediatric meningitis patients with Chloramphenicol, the internationally recommended treatment for bacterial meningitis.

12.    Among other violations of customary international law, Pfizer: (i) failed to develop and adhere to an appropriate test protocol; (ii) failed to perform necessary diagnostic and evaluative testing to ensure that the children selected for its Kano Trovan Test did in fact suffer from bacterial meningitis; (iii) failed to ensure that the test site had sufficient medical staff, necessary materials and sanitation to safely and properly carry out the test; (iv) failed to modify treatment for those children who did not improve after the initial course of therapy; and (v) failed to conduct any, let alone appropriate, follow-up treatment to determine what impact the Kano Trovan Test had on its participants.

13.    At the time the test was carried out, Pfizer was aware of the serious flaws in the Kano Trovan Test and the illegality of its actions. A Pfizer infectious disease specialist assigned to the Kano Trovan Test repeatedly informed Pfizer senior management (before, during, and after the execution of the Test) that the Kano Trovan Test violated international law, federal regulations and medical ethical standards.

14.    Pfizer's violation of international law and federal regulations in the Kano Trovan Test had significant and devastating consequences for the plaintiffs. Several children died shortly after participating in the Kano Trovan Test. Others have suffered permanent physical and/or neurological damages, including paralysis, deafness, and brain damage.

- 5 -

15.    Plaintiffs bring this action pursuant to the Alien Tort Claims Act to recover damages against Pfizer flowing from Pfizer's violations of international law, as set forth, _inter alia,_ in the Nuremberg Code, the Declaration of Helsinki, article 7 of the ICCPR, and other norms of international law proscribing medical experimentation on humans without their consent, and prohibiting torture or other cruel, inhuman, or degrading treatment or punishment.

## II.    **PARTIES**

16.    Rabi Abdullahi, who resides at Kwanar Jajira Bachirawa, was the mother and natural guardian of the late Lubabatu Abdullahi, a girl who died at the age of 13 shortly after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Rabi Abdullahi brings this Action on behalf of her late daughter's estate and on her own behalf individually.

17.    Salisu Abdullahi, who resides at No. 16 Madigawa, Dala L.G., was the father and natural guardian of the late Abdullahi (Manufi) Salisu, a boy who died at the age of 2 after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Salisu Abdullahi brings this Action on behalf of his late son's estate and on his own behalf individually.

18.    Abdullahi Alasan, who resides at No. 260 Bachirawa Quarters, was the father and natural guardian of Firdausi Abdullahi, a girl who died at the age of 16 months after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Abdullahi Alasan brings this Action on behalf of his late daughter's estate and on his own behalf individually.

- 6 -

19.    Ali Hashimu, who resides at Unguwa Uku, Tarauni, Kano, Nigeria, was the father of the late Suleiman Ali, a girl who died at the age of 4 shortly after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Ali Hashimu brings this Action on behalf of his late daughter's estate and on his own behalf individually.

20.    Muhammadu Inuwa, who resides at Kwanar Jajira, Bachirawa, was the father and natural guardian of the late Abdullahi M. Inuwa, a boy who died at the age of 2 shortly after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Muhammadu Inuwa brings this Action on behalf of his late son's estate and on his own behalf individually.

21.    Magaji Alh Ladan, who resides at Danrimi, Ungogo L.G., was the father and natural guardian of the late Kabiru Isyaku, a boy who died at the age of 4 shortly after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Magaji Alh Ladan brings this Action on behalf of his late son's estate and on his own behalf individually.

22.    Suleiman Umar, who resides at Rimin Kebe, Ungogo, Kano, Nigeria, was the father of the late Buhari Suleiman, a boy who died at the age of 3 shortly after being subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria. Suleiman Umar brings this Action on behalf of his late son's estate and on his own behalf individually.

23.    Zainab Abdu is a now 16 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and

- 7 -

suffered injuries as a result. After participating in the Kano Trovan Test, Zainab Abdu was left deaf and mute. Hajia Abdullahi, who resides at Madigawa, Dala L.G., is the mother and natural guardian of Zainab Abdu, and brings this Action on her behalf and on her own behalf individually.

24.     Firdausi Abdullahi is a now 6 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Firdausi Abdullahi was left brain damaged, deaf and mute. Abdullahi Madawaki, who resides at Kwachiri Kurnar Asabe Fagge, Kano, Nigeria, is the father and natural guardian of Firdausi Abdullahi, and brings this Action on her behalf and on his own behalf individually.

25.     Abdullahi Ado is a now 10 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Abdullahi Ado was left deaf and mute. Aisha Ado, who resides at Bacharawa Quarters, Ungogo, Kano, Nigeria, is the mother and natural guardian of Abdullahi Ado, and brings this action on his behalf and on her own behalf individually.

26.     Sani Abdullahi is a now 11 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Sani Abdullahi was left with paralysis of his right arm and leg. Abdullahi Madawaki, who resides at Kwachiri Kurnar Asabe Fagge, Kano, Nigeria, is the father and natural guardian of Sani Abdullahi, and brings this Action on his behalf and on his own behalf individually.

- 8 -

27.    Abdulmajid Ali is a now 8 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Abdulmajid was left partially paralyzed. Alh. Yusuf Ali, who resides at 289 Kul-Kul, Dala L.G.A., is the father and natural guardian of Abdulmajid Ali, and brings this Action on his behalf and on his own behalf individually.

28.    Nura Muhammad Ali is a now 12 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. Muhammad Ali, who resides at Yammata-Tsamiyar Zubai, Bachirawa, is the father and natural guardian of Nura Muhammad Ali, and brings this Action on his behalf and on his own behalf individually.

29.    Umar Badamasi is a now 9 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Umar Badamasi was left partially paralyzed. Malam Badamasi Zubairu, who resides at Kurna-Makaranta, Fagge L-GA, is the father and natural guardian of Umar Badamasi, and brings this Action on his behalf and on his own behalf individually.

30.    Muhammadu Fatahu Danladi is a now 13 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. Alhaji Danladi Ibrahim, who resides at No. 118 Sanka Quarters, Dala L.G. is the father, and natural guardian of Muhammadu Fatahu Danladi, and brings this Action on his behalf and on his own behalf individually.

- 9 -

31.    Dalha Hamza is a now 12 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Dalha Hamza was left deaf and mute. Malam Hamza Gwammaja, who resides at Lain Shehu Mai Haisi, Gwammaja, Dala L.G., is the father and natural guardian of Dalha Hamza, and brings this Action on his behalf and on his own behalf individually.

32.    Tasiu Haruna is a now 9 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Tasiu Haruna was left deaf and mute. Mukhtar Saleh, the village head, or chief of Gayama Village, Ungogo, Kano, Nigeria, is empowered to be the natural guardian of Tasiu Haruna, and brings this Action on his behalf and on his own behalf individually.

33.    Muhyiddeen Hassan is a now 7 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Muhyiddeen was left deaf and mute. Tijjani Hassan, who resides at Dandali Kul-Kul, Dala L.G., is the father and natural guardian of Muhyiddeen Hassan, and brings this Action on his behalf and on his own behalf individually.

34.    Kawu Adamu Ibrahim is a now 14 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Kawu Adamu Ibrahim was left mute. Malam Abamus Ibrahim Adamu, who resides at Dan-Rimi, Ungogo L.G., is the father

- 10 -

and natural guardian of Kawu Adamu Ibrahim, and brings this Action on his behalf and on his own behalf individually.

35.    Sunusi Alh. Ibrahim is a now 14 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Sunusi Alh. Ibrahim was left partially paralyzed and blind. Alhaji Ibrahim Haruna, who resides at Danrimi, Ungogo L.G., is the father and natural guardian of Sunusi Alh. Ibrahim, and brings this Action on his behalf and on his own behalf individually.

36.    Maryam Idris is a now 9 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Maryam Idris was left deaf, mute, and partially paralyzed. Malam Idris, who resides at Kwanar Jajira, Bachirawa, is the father and natural guardian of Maryam Idris, and brings this Action on her behalf and on his own behalf individually.

37.    Yusif Idris is a now 6 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Yusif Idris was left deaf and mute. Idris Umar, who resides at Mile 9 Kadawa Ungogo, Kano, Nigeria, is the father and natural guardian of Yusif Idris, and brings this Action on his behalf and on his own behalf individually.

38.    Hafsat Isa is a now 9 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Hafsat Isa was left partially

- 11 -

paralyzed and suffering from seizures. Isa Muhammed Isa, who resides at No. 244A Kwachiri Kumar Asabe, Fagge, Kano, Nigeria, is the father and natural guardian of Hafsat Isa, and brings this Action on her behalf and on his own behalf individually.

39.    Taju Isa is a now 6 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Taju Isa was left deaf and mute. Malam Isa Usman, who resides at Dogon Nama, Dala L-GA, is the father and natural guardian of Taju Isa, and brings this Action on his behalf and on his own behalf individually.

40.    Hadiza Isyaku is a now 7 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Hadiza Isyaku was left brain damaged. Isyaku Shuaibu, who resides at Bacharawa Quarters, Ungogo, Kano, Nigeria, is the father and natural guardian of Hadiza Isyaku, and brings this Action on her behalf and on his own behalf individually.

41.    Zahra'u Jafaru is a now 6 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Zahra'u Jafaru was left deaf and mute. Jafaru Baba, who resides at No. 360 Yelwa Quarters, Durumin Kul-Kul, Dala L.G., Kano, Nigeria is the father and natural guardian of Zahra'u Jafaru, and brings this Action on her behalf and on his own behalf individually.

42.    Anas Mohammed is a now 12 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and

- 12 -

suffered injuries as a result. After participating in the Kano Trovan Test, Anas Mohammed was left with partial paralysis. Malam Mohammed, who resides at Yammata, Dala L.G., is the father and natural guardian of Anas Mohammed, and brings this Action on his behalf and on his own behalf individually.

43. Nafisatu Muhammed is a now 8 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Nafisatu Muhammed was left deaf and mute. Yahawasu Muhammed, who resides at Bacharawa Quarters, Ungogo, Kano, Nigeria, is the mother and natural guardian of Nafisatu Muhammed, and brings this Action on her behalf and on her own behalf individually.

44. Asma'u Mustapha is a now 10 year-old girl who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. Alhaji Mustapha, who resides at Kul-Kul, Dala L.G. Kano, Nigeria, is the father and natural guardian of Asma'u Mustapha, and brings this action on her behalf and on his own behalf individually.

45. Muhsinu Tijjani is a now 9 year-old boy who was subjected by Pfizer to the Kano Trovan Test administered in March and April 1996 at the IDH Hospital in Kano, Nigeria, and suffered injuries as a result. After participating in the Kano Trovan Test, Muhsinu Tijjani was left partially paralyzed. Tijjani Hassan, who resides at Dandali Kul-Kul, Dala L.G., is the father and natural guardian of Muhsinu Tijjani, a minor, and brings this Action on his behalf and on his own behalf individually.

- 13 -

46.     Defendant Pfizer is a Delaware corporation which maintains its world headquarters at 235 East 42nd Street, New York, New York 10017.  At all times relevant hereto, Pfizer was engaged in the business of developing and manufacturing the pharmaceutical product Trovan.

## III.    JURISDICTION

47.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The plaintiffs are all citizens or subjects of a foreign state (Nigeria), the defendant is a citizen of a U.S. State, and the amount in controversy exceeds $75,000.

48.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which confers district courts with original jurisdiction over all civil actions arising under the laws, including customary international law, and treaties of the United States.

49.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1350, the Alien Tort Claims Act, which provides that " [t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

50.     The Alien Tort Claims Act permits aliens to bring actions against non-state actors for tort claims arising from violations of customary international law.  See *Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir. 1995).

## IV.    LEGAL FRAMEWORK

### A.    Relevant Customary International Law and Treaties of the United States

51.     Customary international law is made up of the fundamental principles of a civilized society that are so widely held that they constitute binding norms on the community of nations.  The

Restatements of the Law, Third, Foreign Relations Law, § 102 (1987), defines customary international law as "general principles common to the major legal systems of the world" and as the "general and consistent practice of states followed by them from a sense of legal obligation."

52.    The law of nations, which has always been part of the federal common law "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law."[1]

53.    The general usage and practice of nations in the field of human rights may be found in treaties, internationally or regionally adopted covenants, declarations of human rights, and the foreign policy goals of the United States and other countries in the field of human rights.[2]

54.    American Courts have recognized that the right to be free from cruel, unhuman or degrading treatment is a universally accepted customary human rights norm.[3]

55.    Furthermore, it is generally conceded that the core of customary international law are the requirements of minimal decency articulated by the Nuremberg Code. The Nuremberg Code sets forth the international standards of conduct governing biomedical research on human subjects and was drafted in response to the horrors of the Nazi's depraved medical experimentation on children as well as adults.

---

[1] *United States v. Smith*, 18 U.S. 153, 160-61 (1820).

[2] *See Jama v. United States Immigration and Naturalization Serv.*, 22 F. Supp. 2d 353, 361 (D.N.J. 1998).

[3] *See, e.g., Filartiga v. Pena-Irala*, 630 F.2d 876, 880, 884-86 (2d Cir. 1980) (torture perpetrated under the color of official authority violates universally accepted norms of international human rights law, and such a violation of international law constitutes a violation of the domestic law of the United States, giving rise to a claim under the ATCA).

- 15 -

56.    The Nuremberg Code of 1947 states:

Principle 1:

*The voluntary consent of the human subject is absolutely essential.*

*This means that the person involved should have legal capacity to give consent*; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and *should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment.*

*The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.*

Principle 2
The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature.

Principle 3
*The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study that the anticipated results will justify the performance of the experiment.*

Principle 4
The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury.

Principle 5
*No experiment should be conducted where there is an a priori reason to believe that death or disabling injury will occur; except,*

- 16 -

perhaps, in those experiments where the experimental physicians also serve as subjects.

Principle 6

The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

Principle 7

*Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability or death.*

Principle 8

The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.

Principle 9

*During the course of the experiment the human subject should be at liberty to bring the experiment to an end if he has reached the physical or mental state where continuation of the experiment seems to him to be impossible.*

Principle 10

*During the course of the experiment the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgment required of him, that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject.*

(emphasis added).

57.    The Nuremberg Code has become a part of the law of nations, and the international common law, and can be applied to both civil and criminal cases in state and federal courts in the United States.

- 17 -

58.    The Nuremberg Code's proscription of biomedical research without informed consent is also enshrined in the ICCPR, a treaty to which the United States is a party. The ICCPR provides in article 7 that,

> No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. *In particular, no one shall be subjected without his free consent to medical or scientific experimentation.*

(emphasis added).

59.    The ICCPR was adopted and opened for signature, ratification and accession by the U.N. General Assembly in 1966 and entered into force in 1976. Thus, medical experimentation without informed consent is a violation of article 7 of the ICCPR and therefore a violation of international law.

60.    As the Office of the United Nations High Commissioner for Human Rights general commentary to article 7 explains,

> the prohibition in article 7 relates not only to acts that cause physical pain but also to acts that cause mental suffering to the victim. . . .It is appropriate to emphasize in this regard that *article 7 protects, in particular, children,* pupils and *patients in teaching and medical institutions. . . . The right to lodge complaints against maltreatment prohibited by article 7 must be recognized in the domestic law.*

October 4, 1992 ICCPR General comment 20 (emphasis added).

61.    More generally, the Universal Declaration of Human Rights at article 5 states, "No one shall be subject to torture or to cruel, inhuman or degrading treatment or punishment."

62.    The Declaration of Helsinki of the World Medical Association, first promulgated in 1964 (the "Declaration"), also prohibits non-consensual medical experimentation. The Declaration has been called the fundamental document in the field of ethics in biomedical research.

- 18 -