63.   The Declaration sets forth minimum acceptable international standards for the conduct of medical experimentation on humans. The Declaration provides, among other things, that:

Biomedical research involving human subjects must conform to generally accepted scientific principles and should be based on adequately performed laboratory and animal experimentation and on a thorough knowledge of the scientific literature.

The design and performance of each experimental procedure involving human subjects should be clearly formulated in an experimental protocol which should be transmitted to a specially appointed independent committee for consideration, comment and guidance.

Biomedical research involving human subjects should be conducted only by scientifically qualified persons and under the supervision of a clinically competent medical person. . . .

Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject. . . .

Concern for the interests of the subject must always prevail over the interests of science and society.

*The right of the research subject to safeguard his or her integrity must always be respected.* . . .

Physicians should abstain from engaging in research projects involving human subjects unless they are satisfied that the hazards involved are believed to be predictable. . . .

*In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail.* . . .

*The potential benefits, hazards and discomfort of a new method should be weighed against the advantages of the best current diagnostic and therapeutic methods.*

*In any medical study, every patient - including those of a control group, if any - should be assured of the best proven diagnostic and therapeutic method.*

- 19 -

The physician can combine medical research with professional care, the objective being the acquisition of new medical knowledge, only to the extent that medical research is justified by its potential diagnostic or therapeutic value for the patient.

(Emphasis added).

64.    Another source of international standards for medical research is International Ethical Guidelines for Research Involving Human Subjects (the "CIOMS Guidelines") jointly produced by the Council for International Organizations of Medical Sciences ("CIOMS") and the World Health Organization.  The CIOMS Guidelines were created to provide guidance as to how the ethical principles embodied in the Nuremberg Code, article 7 of the ICCPR, and the Declaration of Helsinki could be effectively applied in developing countries.  These guidelines emphasize the importance of informed consent and establish principles for doing research in "underdeveloped communities" and further evidence international agreement on guiding principles for medical research involving human subjects.

65.    The CIOMS Guidelines state in relevant part:

*Guideline 1: Individual Informed Consent*

**For all biomedical research involving human subjects, the investigator must obtain the informed consent of the prospective subject or, in the case of an individual who is not capable of giving informed consent, the proxy consent of a properly authorized representative.**

*Commentary on Guideline 1*

*General considerations.*  Informed consent is consent given by a competent individual who has received the necessary information; who has adequately understood the information; and who, after considering the information, has arrived at a decision without having

- 20 -

been subjected to coercion, undue influence or inducement, or intimidation.

Informed consent is based on the principle that competent individuals are entitled to choose freely whether to participate in research.

In itself, informed consent is an imperfect safeguard for the individual, and it must always be complemented by independent ethical review of research proposals. Moreover, many individuals, including young children, many adults with severe mental or behaviourial disorders, and many persons who are totally unfamiliar with modern medical concepts, are limited in their capacity to give adequate informed consent. Because their consent could imply passive and uncomprehending participation, investigators must on no account presume that consent given by such vulnerable individuals is valid, without the prior approval of an independent ethical-review body. When an individual is incapable of making an informed decision whether to participate in research, the investigator must obtain the proxy consent of the individual's legal guardian or other authorized representative.

Investigators should never initiate research involving-human subjects without obtaining each subject's informed consent, unless they have received explicit approval to do so from an ethical review committee.

### Guideline 2:     *Essential information for prospective research subjects*

**Before requesting an individual's consent to participate in research, the investigator must provide the individual with the following information, in language that he or she is capable of understanding:**

- **that each individual is invited to participate as a subject in research, and the aims and methods of the research; - the expected duration of the subject's participation; -the benefits that might reasonably be expected to result to the subject or to others as an outcome of the research;**
- **any foreseeable risks or discomfort to the subject associated with participation in the research;**
- **any alternative procedures or courses of treatment that might be as advantageous to the subject as the procedure or treatment being tested;**

- the extent to which confidentiality of records in which the subject is identified will be maintained;
- the extent of the investigator's responsibility, if any, to provide medical services to the subject;
- that therapy will be provided free of charge for specified types of research-related injury;
- whether the subject or the subject's family or dependants will be compensated for disability or death resulting from such injury; and
- that the individual is free to refuse to participate and will be free to withdraw from the research at any time without penalty or loss of benefits to which he or she would otherwise be entitled.

*Commentary on Guideline 2*

*Risks.* In the case of complex research projects it may be neither feasible nor desirable to inform prospective subjects fully about every possible risk. *However, they must be informed of all risks that a reasonable person would consider material to making a decision about whether to participate.* An investigator's judgment about what risks are to be considered material should be reviewed and approved by the ethical review committee (see Guideline 3). Subjects who desire additional information should be afforded an opportunity to ask questions. (emphasis added).

\* \* \*

### Guideline 3: Obligations of investigators regarding informed consent

**The investigator has a duty to:**

- communicate to the prospective subject all the information necessary for adequately informed consent;
- give the prospective subject full opportunity and encouragement to ask questions;
- exclude the possibility of unjustified deception, undue influence and intimidation;
- seek consent only after the prospective subject has adequate knowledge of the relevant facts and of the consequences of participation, and has had sufficient opportunity to consider whether to participate;

- 22 -

- as a general rule, obtain from each prospective subject a signed form as evidence of informed consent; and
- renew the informed consent of each subject if there are material changes in the conditions or procedures of the research.

*Commentary on Guideline 3*

*Necessary information.* The standards for communicating information as set forth in Guidelines 2 and 3 should be regarded as minimum. Other types of information that should be conveyed include the reasons for selecting prospective subjects (ordinarily because they either have certain diseases or have no apparent disease) and certain features of the research design (for example, randomization, double-blind, case-control), stated in language that the subjects can understand. . . . . In general the standard for communicating information is that any and all information that a reasonable person would consider material to reaching a decision about whether to consent should be communicated.

\* \* \*

*Undue influence.* The investigator should not give the prospective subject any unjustifiable assurances about the benefits, risks or inconveniences of the research.

\* \* \*

*Intimidation.* Prospective subjects who are patients often depend upon the investigator for medical care, and the investigator has a certain credibility in their eyes. . . . The investigator must assure prospective subjects that their decision on whether to participate will not affect the therapeutic relationship or any other benefits to which they are entitled.

*Documentation of consent.* Consent may be indicated in a number of ways. The subject may imply consent by his or her voluntary actions, express consent orally, or sign a consent form. As a general rule, the subject should sign a consent form, or, in the case of incompetence, a legal guardian or other duly authorized representative should do so. The ethical review committee may approve the waiving of the requirement of a signed consent form if the research carries no more than minimal risk and if the procedures to be used are only those for

- 23 -

which signed consent forms are not customarily required outside the research context. . . . [T]hese may resemble consent forms in all respects except that subjects are not required to sign them.

\* \* \*

*Guideline 5: Research involving children*

**Before undertaking research involving children, the investigator must ensure that:**

\* \* \*

- **a parent or legal guardian of each child has given proxy consent;**
- **the consent of each child has been obtained to the extent of the child's capabilities;**
- **the risk presented by interventions not intended to benefit the individual child-subject is low and commensurate with the importance of the knowledge to be gained; and**
- **interventions that are intended to provide therapeutic benefit are likely to be at least as advantageous to the individual child-subject as any available alternative.**

*Commentary on Guideline 5*

\* \* \*

*Consent of the child. . . . . Older children who are capable of informed consent should be selected before younger children or infants, unless there are important scientific reasons related to age for involving younger children first. (emphasis added).*

\* \* \*

*Proxy consent of a parent or guardian.* The investigator must obtain the proxy consent of the parent or guardian in accordance with local laws or established procedures.

\* \* \*

*Observation of research by parent.* A parent or guardian who gives proxy consent for a child to participate in research should be given the opportunity to observe the research as it proceeds, so as to be able

- 24 -

to withdraw the child from the research if the parent or guardian decides it is in the child's best interests to do so.

\* \* \*

### Guideline 8: Research involving subjects in underdeveloped communities

**Before undertaking research involving subjects in underdeveloped communities, whether in developed or developing countries, the investigator must ensure that:**

- **persons in underdeveloped communities will not ordinarily be involved in research that could be carried out reasonably well in developed communities;**
- **the research is responsive to the health needs and the priorities of the community in which it is to be carried out;**
- **every effort will be made to secure the ethical imperative that the consent of individual subjects be informed; and**
- **the proposals for the research have been reviewed and approved by an ethical review committee that has among its members or consultants persons who are thoroughly familiar with the customs and traditions of the community.**

*Commentary on Guideline 8*

\* \* \*

Individuals and families in such communities are liable to exploitation for various reasons. Some of them may be relatively incapable of informed consent because they are illiterate, unfamiliar with the concepts of medicine held by the investigators, or living in communities in which the procedures typical of informed-consent discussions are unfamiliar or alien to the ethos of the community. Certain investigators may wish to take advantage of the lack in most developing countries of well-developed regulations or ethical review committees, which could have the effect of delaying access to research subjects; others may find it less expensive to conduct in developing countries research designed to develop drugs and other products for the markets of developed countries.

- 25 -

\* \* \*

Investigators must respect the ethical standards of their own countries and the cultural expectations of the societies in which research is undertaken, unless this implies a violation of a transcending moral role.

\* \* \*

The research conducted in underdeveloped communities should be responsive to the health needs and priorities of those communities. It should not exhaust resources which the community usually devotes to the health care of its members. If any product is to be developed, such as a new therapeutic agent, clear understanding should be reached among investigators, sponsors, representatives of the collaborating countries, and community leaders about what the community is to expect and what can or cannot be provided during and at the close of the research. Such understanding must be reached before the research is begun, to ensure that the research is truly responsive to the priorities of the community.

\* \* \*

*Informed consent.* All reasonable efforts should be made to obtain the informed consent of each prospective subject according to the standards specified in Guidelines 1 to 3, to ensure that the rights of prospective subjects are respected. For example, when because of communication difficulties investigators cannot make prospective subjects sufficiently aware of the implications of participation to give adequately informed consent, the decision of each prospective subject on whether to consent should be elicited through a reliable intermediary such as a trusted community leader. . . . However consent is obtained, all prospective subjects must be clearly told that their participation is entirely voluntary, and that they are free to refuse to participate or to withdraw their participation at any time without loss of any entitlement. The investigator is required to ensure that each prospective subject is clearly told everything that would be conveyed if the study were to be conducted in a developed community and, further, to ensure that earnest attempts are made to enable the prospective subject to understand this information; otherwise, assurance of freedom to refuse or withdraw from participation would be meaningless.

- 26 -

All plans to use the above standard for informing, providing assistance with understanding, and assuring freedom to refuse or withdraw must be approved by an ethical review committee and supplemented with other means of assuring that the rights of prospective subjects are respected.

*Ethical review.* The ability to judge the ethical acceptability of various aspects of a research proposal requires a thorough understanding of a community's customs and traditions. The ethical review committee must have as either members or consultants persons with such understanding, so that the committee may evaluate proposed means of obtaining informed consent and otherwise respecting the rights of prospective subjects. Such persons should be able, for example, to identify appropriate members of the community to serve as intermediaries between investigators and subjects, to decide whether material benefits or inducements may be regarded as appropriate in the light of a community's gift-exchange traditions, and to provide safeguards for data and personal information that subjects consider to be private or sensitive.

\* \* \*

## Guideline 10: *Equitable distribution of burdens and benefits*

**Individuals or communities to be invited to be subjects of research should be selected in such a way that the burdens and benefits of the research will be equitably distributed. Special justification is required for inviting vulnerable individuals and, if they are selected, the means of protecting their rights and welfare must be particularly strictly applied.**

*Commentary on Guideline 10*

*General considerations.* . . . Classes of individuals traditionally considered vulnerable are those with limited capacity or freedom to consent. They are the subject of specific guidelines in this publication and include children. Ethical justification of their involvement usually requires that investigators satisfy ethical review committees that:

- the research could not be carried out reasonably well with less vulnerable subjects;

- 27 -

- the research is intended to obtain knowledge that will lead to improved diagnosis, prevention or treatment of diseases or other health problems characteristic of or unique to the vulnerable class, either the actual subjects or other similarly situated members of the vulnerable class;

- research subjects and other members of the vulnerable class from which subjects are recruited will ordinarily be assured reasonable access to any diagnostic, preventive or therapeutic products that will become available as a consequence of the research;

- the risks attached to research that is not intended to benefit individual subjects will be minimal, unless an ethical review committee authorizes a slight increase above minimal risk (see Guideline 5); and

- when the prospective subjects are either incompetent or otherwise substantially unable to give informed consent, their agreement will be supplemented by the proxy consent of their legal guardians or other duly authorized representatives.

\* \* \*

### Guideline 13:  *Right of subjects to compensation*

**Research subjects who suffer physical injury as a result of their participation are entitled to such financial or other assistance as would compensate them equitably for any temporary or permanent impairment or disability.  In the case of death, their dependants are entitled to material compensation.  The right to compensation may not be waived.**

*Commentary on Guideline 13*

\* \* \*

*Obligation of the sponsor to pay.*    The sponsor, whether a pharmaceutical company, a government, or an institution, should agree, before the research begins, to provide compensation for any physical injury for which subjects are entitled to compensation. Sponsors are advised to obtain adequate insurance against risks to cover compensation, independent of proof of fault.

*Guideline 14:  Constitution and responsibilities of ethical review committees*

**All proposals to conduct research involving human subjects must be submitted for review and approval to one or more independent ethical and scientific review committees.  The investigator must obtain such approval of the proposal to conduct research before the research is begun.**

*Commentary on Guideline 14*

*General considerations.*  Whatever the circumstances, however, society has a dual responsibility to ensure that:

- all drugs, devices and vaccines under investigation in human subjects meet adequate standards of safety; and
- the provisions of the Declaration of Helsinki are applied in all biomedical research involving human subjects.

*Assessment of safety.*  Authority to assess the safety and quality of medicines and vaccines intended for use in humans is most effectively vested in a multidisciplinary advisory committee.

\* \* \*

Committees competent to review and approve scientific aspects of clinical trials must be multidisciplinary, much like those specified earlier for assessment of safety.  In many cases such committees operate most effectively at the national level.

\* \* \*

In Phases II and III of drug testing and Phase III of vaccine testing, when benefits are intended for the subjects and they are reasonably likely to be realized, it is permissible to involve members of vulnerable groups and persons with limited capacity to consent. However, as required by the Declaration of Helsinki, Article II.3, "every patient -- including those of a control group, if any -- should be assured of the best proven diagnostic and therapeutic method."

\* \* \*

- 29 -

Ethical justification to begin a randomized clinical trial also meets the requirements of Article II.3. The therapies (or other interventions) to be compared must be regarded as equally advantageous to the prospective subjects: there should be no scientific evidence to establish the superiority of one over another. Moreover, no other intervention must be known to be superior to those being compared in the clinical trial, unless eligibility to participate is limited to persons who have been unsuccessfully treated with the other superior intervention or to persons who are aware of the other intervention and its superiority and have chosen not to accept it.

For each randomized clinical trial there should be a data and safety monitoring committee, responsible for monitoring the data obtained in the course of a study and for making recommendations to the sponsors and investigators about modifying or terminating the study, or about amending the informed-consent process or form.

\* \* \*

*Committee membership.* Local review committees should be so composed as to be able to provide complete and adequate review of the research activities referred to them. They should include physicians, scientists and other professionals, such as nurses, lawyers, ethicists and clergy, as well as lay persons qualified to represent the cultural and moral values of the community. The membership should include both men and women.

\* \* \*

Similarly, committees that review research involving such vulnerable groups as children, students, aged persons or employees should consider the advantages of including representatives of, or advocates for, such groups.

\* \* \*

*Need for particularly stringent review requirements.* The requirements of review committees should be particularly stringent in the case of proposed research involving children, . . . communities unfamiliar with modern clinical concepts. . . . In considering such proposals the review committee should be especially attentive in determining that selection of research subjects is both equitable

- 30 -

(designed to distribute fairly the burdens and benefits of research) and likely to minimize risk to subjects.

*   *   *

*Information to be provided by investigators.* Whatever the procedure adopted for ethical review, such review should be based on a detailed protocol comprising:

- a clear statement of the research objectives, having regard to the present state of knowledge, and a justification for undertaking the investigation in human subjects;
- a precise description of all proposed interventions, including intended dosages of drugs and planned duration of treatment;
- a description of plans to withdraw or withhold standard therapies in the course of the research;
- a description of the plans for statistical analysis of the study, which includes a calculation of the statistical power of the study, specifies the criteria for terminating the study, and demonstrates that the proper number of subjects will be recruited;
- the criteria determining admission and withdrawal of individual subjects, including full details of the procedure for seeking and obtaining informed consent;
- an account of any economic or other inducements to participate, such as offers of cash payments, gifts, or free services or facilities, and of any financial obligations assumed by the subjects, such as payment for medical services; and
- for research carrying more than minimal risk of physical injury, an account of plans, if any, to provide medical therapy for such injury and to provide compensation for research-related disability or death.

Information should also be included to establish:

- the safety of each proposed intervention and of any drug or vaccine to be tested, including the results of relevant laboratory and animal research;
- the anticipated benefits and the risks of participation;
- the means proposed to obtain individual informed consent or, when a prospective subject is not capable of informed consent, satisfactory assurance that proxy consent will be

obtained from a duly authorized person and that the rights and welfare of each subject will be adequately protected;

- the identification of the organization that is sponsoring the research and a detailed account of the sponsor's financial commitments to the research institution, investigators, research subjects and, when appropriate, the community;

- plans to inform subjects about harms and benefits during the study, and of the results of the study at its conclusion;

- an explanation of who will be involved in the research, their age, sex and circumstances, and, if any classes are excluded, the justification for the exclusion;

- justification for involving as research subjects persons with limited capacity to consent or members of vulnerable social groups;

- evidence that the investigator is qualified and experienced and is assured of adequate facilities for the safe and efficient conduct of the research;

- provisions that will be made for protecting the confidentiality of data; and,

- the nature of any other ethical considerations involved, together with an indication that the principles of the Declaration of Helsinki will be implemented.

## Guideline 15:  Obligations of sponsoring and host countries

**Externally sponsored research entails two ethical obligations:**

- **An external sponsoring agency should submit the research protocol to ethical and scientific review according to the standards of the country of the sponsoring agency, and the ethical standards applied should be no less exacting than they would be in the case of research carried out in that country.**

- **After scientific and ethical approval in the country of the sponsoring agency, the appropriate authorities of the host country, including a national or local ethical review committee or its equivalent, should satisfy themselves that the proposed research meets their own ethical requirements.**

*Commentary on Guideline 15*

* * *

*Obligations of external sponsors*. . . . . [S]ponsors have an obligation to ensure that subjects who suffer injury. . . . as a consequence of research interventions obtain medical treatment free of charge, and that compensation is provided for death or disability occurring as a consequence of such injury. Sponsors are expected to ensure that research subjects and the communities for which they are recruited are not made worse off as a result of the research (apart from justifiable risks of research interventions) for example, by the diversion of scarce local resources to research activities.

**B.    Specific Provisions Guaranteeing a Private Remedy for Human Rights Abuses**

66.    The ICCPR requires each state party to ensure victims of abuses "an effective remedy." ICCPR art. 2(3)(a).

67.    The United Nations Universal Declaration of Human Rights states at Article 8, "Everyone has the right to an effective remedy by the competent national tribunals for acts violating [one's] fundamental rights". The remedy must be adjudicatory, guaranteeing the victim of a human rights abuse his or her day in court." Universal Declaration of Human Rights, G.A. res. 217A (III) (Dec. 10, 1948); U.N. GAOR, 3d Sess. Supp. No. 49.

**C.    Relevant United States Regulations Concerning Human Experimentation**

68.    The FDA may accept clinical studies conducted outside the U.S. in support of safety and efficacy claims for drugs, but these studies, generally conducted under an Investigational New Drug ("IND") exemption, are governed by the FDA informed consent and Institutional Review Board ("IRB") requirements.[4] [See 21 C.F.R. § 312 (2001), IND Regulations].

---

[4]IRBs are responsible for continuing review of ongoing research to ensure that the rights and welfare of human subjects are protected. IRBs are designed to function as independent peer review for clinical research. IRBs are required to approve research. Among other responsibilities, the IRB should ensure that risks to subjects are minimized, informed consent

(continued...)

- 33 -

69.    The FDA will accept a foreign clinical study involving a drug not conducted under an IND only if the study conforms to whichever of the following provides greater protection of human subjects: the ethical principles contained in the 1989 version of the Declaration of Helsinki (which as discussed above, among other things, requires that informed consent be obtained) or the laws and regulations of the country in which the research was conducted. [21 C.F.R. § 312.120(c)(1) (2001)].

70.    In addition, all foreign clinical trials must conform to the standards of Good Clinical Practice.

**I.    Regulations Applicable to Clinical Research Conducted in the U.S.**

71.    The FDA has defined the required elements of informed consent to include:

(1) a statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental; (2) a description of any reasonably foreseeable risks or discomforts to the subject; (3) a description of any benefits to the subject or to others which may reasonably be expected from the research; (4) a disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject; (5) a statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained. . . ; (6) for research involving more than minimal risk, an explanation as to whether any compensation [sic] and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained; (7) an explanation of whom to contact for answers to pertinent questions about the research and research subjects' rights, and whom to contact in the event of a research related injury to the subject; and (8) a statement that participation is voluntary, that refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled. 21 C.F.R § 50.25(a).

---

[4]/(...continued)
is adequate and appropriately documented, and appropriate safeguards have been included to protect vulnerable subjects. 21 C.F.R. § 56.111.

72.    Further, FDA regulations require that informed consent be documented in a written consent form approved by an IRB, signed and dated by the subject or the subject's legally authorized representative at the time of the consent, unless such requirement has been specifically waived. 21 C.F.R. §§ 50.27, 56.109 (2001).

73.    FDA regulations also provide heightened protections for children in clinical investigations. Clinical investigations involving greater than minimal risk to children must present the prospect of direct benefit to individual subjects and such risk must be justified by the anticipated benefit to the subjects, the relation of the anticipated benefit must be as favorable as available alternative approaches, and adequate provisions must be made for soliciting the assent of the children and the permission of their parents or guardians.

74.    Under FDA regulations,

no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative.

21 C.F.R. § 50.20 (2001).

75.    Also according to FDA regulations, when the study subject population includes non-English speaking people or the clinical investigator or the IRB anticipates that the consent interviews will be conducted in another language, the IRB should require a translated consent document to be prepared and assure that the translation is accurate. A copy of the consent document must be given to each subject, in the language understood by the study subject.

- 35 -

76.    FDA regulation 21 C.F.R. § 56.107(e) (2001) prohibits any member of a clinical investigation team from participating in IRB review of any study except to provide information to the IRB because of potential conflict of interest.

77.    When a proposed change in a research study is not minor (*e.g.*, procedures involving increased risk or discomfort are to be added), then an IRB must review and approve the proposed change at a convened meeting before the change can be implemented.  The only exception is a change necessary to eliminate apparent immediate hazards to the research subjects. (21 C.F.R. § 56.108(a)(4)(2001)).  In such a case, the IRB should be promptly informed of the change following its implementation and should review the change to determine that it is consistent with ensuring the subjects' continued welfare.

78.    Although the FDA does provide an exception from the informed consent requirement in emergencies, that exception requires that both the investigator and a physician who is not otherwise participating in the clinical investigation certify in writing that: (1) the subject was confronted by a life threatening situation; (2) informed consent cannot be obtained because of an inability to communicate with or obtain legally effective consent from the subject; (3) time is not sufficient to obtain consent from the subject's legal representative; and (4) no alternative method of approved or generally recognized therapy is available that provides an equal or greater likelihood of saving the subject's life.  21 C.F.R. § 50.24.

79.    Pfizer's conduct in Nigeria in the Kano Trovan Test was subject to FDA regulations because such regulations are conduct regulating and because the FDA regulations are expressly incorporated by the CIOMS Guidelines.

- 36 -

80.    The Nuremberg Code, article 7 of the ICCPR, the Declaration of Helsinki, the CIOMS Guidelines and the FDA regulations set forth the minimum United States and international standards of conduct governing biomedical research on human subjects, and constitute international customary law, norms of international law or the law of nations.

81.    Furthermore, the proposition that international customary law prohibits medical experimentation on humans without their consent is indisputable. In addition to those international agreements discussed above, this principle is enshrined in numerous other international treaties and covenants.[5]

2.    **Relevant Standards of Good Clinical Practice**

---

[5]/*See, e.g.,* the Multilateral Treaty for the Protection of War Victims: Prisoners of War, 6 U.S.T. 3316; 1949 U.S.T. LEXIS 483, at *13 (Feb. 2, 1956) (provides that "no prisoner of war may be subjected to physical mutilation or to medical or scientific experiments of any kind which are not justified by the medical, dental or hospital treatment of the prisoner concerned and carried out in his interest"); Multilateral Treaty for the Protection of War Victims: Civilian Persons, 6 U.S.T. LEXIS 3516, No. TIAS-3365, 1949 U.S.T. LEXIS 484, at *23 (Feb. 2, 1956) (prohibiting medical or scientific experiments not necessitated by the medical treatment of a protected person"); Principles of Medical Ethics relevant to the Role of Health Personnel, particularly Physicians in the Protection of Prisoners and Detainees against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Adopted by the United Nations General Assembly Resolution 37/194 of Dec. 18, 1982, at Principle 2 ("It is a gross contravention of medical ethics, as well as an offence under applicable international instruments, for health personnel, particularly physicians, to engage, actively or passively, in acts which constitute participation in, complicity in, incitement to or attempts to commit torture or other cruel, inhuman or degrading treatment or punishment."); Multilateral Treaty for the Protection of War Victims: Armed Forces in the Field, art. 12, 6 U.S.T. 3114, No. TIAS-3362, 1949 U.S.T. LEXIS 479, at *10 (Feb. 2, 1956) (members of the armed forces "shall not be . . . . subjected to torture or to biological experiments; they shall not willfully be left without medical assistance and care, nor shall conditions exposing them to contagion or infection be created.").

- 37 -

82.    Good clinical practice in clinical research requires that patients should have a complete history and physical examination at entry, both to confirm the diagnosis under study and to exclude other diagnoses.

83.    The standard of care for bacterial meningitis requires that a central spinal fluid analysis ("CSF"), or lumbar puncture, and a Gram's stain blood test, be performed to diagnose the disease.

84.    A log of all potential patients should be kept, but only those with CSF analysis/Gram's stain consistent with a bacterial meningitis diagnosis should be enrolled in the study.

85.    Exclusion criteria should be used to exclude: (1) patients who do not have the disease under the study, (2) patients whose disease has progressed to a stage where drug intervention may be too late or inadequate, (3) patients who have a potentially unacceptable risk of adverse effects, and (4) patients with a serious underlying disease such that the risk of participation in the study may not result in a benefit for either the patient or the study outcome.

86.    In non-U.S. clinical studies involving bacterial meningitis, the standard of care provided should be similar to that provided to patients in the United States. The guidelines for good clinical practice for conducting meningitis experimentation do not support testing in facilities lacking basic hygiene, diagnostic equipment, and sufficient medical staff.

87.    Industry guidelines governing meningitis experiments also call for a second CSF analysis a day or two after treatment begins to ensure that the patient is responding to treatment.

88.    Industry guidelines for good clinical practice for conducting meningitis experiments do not support testing during an epidemic.

- 38 -

89.    After treatment for bacterial meningitis, further follow-up visits for assessment of hearing, physical and neurological status should be conducted at five to six weeks and at five to seven months after completion of therapy.

90.    A study outcome must be sound, clearly written and thoroughly developed.  The protocol serves as the template for all procedures, tests or steps that are undertaken; all data collected; and all the information that is recorded during the course of a trial.

91.    A good protocol does not automatically ensure a well-conducted clinical trial.  The clinical trial will only be successful and its results plausible if the protocol is carefully followed, if protocol compliance is high, and if protocol violations are kept to a minimum.   Information requested under the protocol should be obtained and documented under conditions and in time frames specified in the protocol.

92.    Consent forms should be written in compliance with FDA guidelines and should completely and clearly explain risks versus benefits of enrollment in the study.

93.    In pediatric trials, special attention should be given to obtaining consent.

94.    A signed informed consent document is evidence that the document has been provided to a prospective subject and presumably explained and that the subject has agreed to participate in the research.   IRB review of informed consent documents also ensures that the institution has complied with applicable guidelines.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

95.    Trovafloxacin mesylate, which Pfizer sells under the brand name "Trovan," is a broad spectrum quinolone class antibiotic developed and synthesized by Pfizer. It is believed that Trovan attacks bacteria responsible for a wide range of illnesses.

96.    At the time of its development in the mid-1990s, Trovan was expected to be an important new product for Pfizer. Wall Street analysts predicted that Trovan could be one of the most financially successful drugs of its kind in years and that Pfizer, which had total annual sales of $16.2 billion in 1999, could reap an additional $1 billion per year if Trovan was approved by the FDA for all its potential uses.

97.    Beginning in 1996, in order to obtain FDA approval for all of Trovan's potential uses, Pfizer conducted the largest testing program ever undertaken, enrolling thousands of people world-wide in clinical tests of Trovan.

98.    Pfizer was aware that Trovan had the potential to cause significant side effects in children, as other quinolone class antibiotics have been shown to cause joint damage in animal studies. Prior animal studies showed that Trovan, when administered to immature rats and dogs, caused joint disease, abnormal cartilage growth, and osteochondiosis, which is characterized by degeneration of the cartilage and bone followed by defective bone formation in the growing portion of the skeleton, and can be crippling.

99.    Pfizer also knew that Trovan was associated with liver toxicity prior to the conception and launch of the Kano Trovan Test. In animal studies, Trovan caused liver changes in all rats who received the drug, and no safe dosage was established for the species. In one canine experiment,

- 40 -

liver damage occurred in one-quarter of subjects administered Trovan. Further, the signal and presence of adverse effects on the liver existed in clinical trials on the human population.

100.    As a result, Pfizer knew that it would need extensive, convincing tests that proved Trovan was safe and effective in order to secure approval for Trovan to be used on children.

101.    To that end, in early 1996, Dr. Scott Hopkins, the Group Director for anti-infective clinical development at Pfizer Central Research in Groton, Connecticut, learned from an Internet site that an epidemic of bacterial meningitis was raging in Northern Nigeria. Bacterial meningitis is a serious infection of the brain and spinal cord for which effective remedies already exist. Northern Nigeria was also under siege in 1996 by concurrent cholera and measles epidemics for which effective remedies also exist.

102.    Sensing an ideal opportunity to test Trovan on human subjects, Dr. Hopkins proposed to senior Pfizer executives that he lead a six person team to Kano, Nigeria to establish that Trovan in oral form could work as well in children as a fast-acting intravenous antibiotic already proven effective.

103.    Kano is an impoverished city of two million people in northern Nigeria, a country which during 1996 was beset by civil strife and governed by a dictator, General Sani Abacha.

104.    Pfizer authorized the proposal for the Kano Trovan Test, which if successful, would have paved the way for Pfizer to seek FDA approval for the marketing of Trovan to treat non-meningitis infections in children in the U.S. -- a potentially lucrative outlet for the drug for Pfizer.

105.    Prior to the Pfizer Kano Trovan Test, only _one_ child had ever been given Trovan, and that was for "compassionate reasons," that is, because all other antibiotics had failed.

106.    At the time, no child had been given the oral formulation of Trovan.

- 41 -

### B.    Pfizer Begins its Kano Trovan Test

107.    Within six weeks of discovering the existence of the meningitis epidemic in Northern Nigeria, Pfizer had assembled a protocol for its Kano Trovan Test. This timing was unusual in that such protocols usually take a year or more to develop. Pfizer informed the FDA of its intent to conduct the study under the export waiver option on March 15, 1996.

108.    Before Trovan could be exported to Nigeria for a clinical trial, Pfizer needed to secure FDA authorization for export. For such purposes, Pfizer obtained the required letter of request from the Nigerian government which was received by the FDA on March 20, 1996.[6] Later that day, the FDA released Trovan for export to Nigeria.

109.    Thereafter, in or about April, 1996, Pfizer researchers chartered a DC-9 and departed for Kano's Infectious Disease Hospital ("IDH") to begin testing of Trovan on children.    Pfizer's Kano Trovan Test team consisted of three U.S. physicians, including Dr. Hopkins and his wife, who is also a physician; and four Nigerian doctors, including, Dr. Isa Dutse, a Nigerian infectious disease specialist.

110.    Kano's IDH is very different from western concepts of an infectious disease hospital. It is a collection of several single story cinder block buildings, some of which lack electricity and running water. At the time of Pfizer's arrival, the conditions at IDH were squalid, as the hospital was overwhelmed by patients seeking care. All of the hospital's beds were filled, and patients seeking care overflowed onto the grounds of the hospital.

---

[6]    In addition to providing the requisite request for a clinical trial letter to the FDA, Nigeria's dictatorship facilitated Pfizer's efforts to conduct the Kano Trovan Test, among other things, arranging for Pfizer's accommodation in Kano, and acting to silence Nigerian physicians critical of the Company's Test.

- 42 -

111    Prior to Pfizer's arrival in northern Nigeria, MSF had journeyed to Kano's IDH Hospital, to offer humanitarian treatment.  Because of space constraints, MSF established their headquarters in a tent on IDH grounds.   To combat bacterial meningitis, MSF dispensed chloramphenicol, a relatively inexpensive antibiotic. Notably, chloramphenicol is the drug recommended by the World Health Organization for treatment of bacterial meningitis in epidemic situations like that in Kano.

112.    MSF had organized a treatment plan such that the sickest patients were admitted to hospital beds and the less ill confined to mats in tents erected throughout the hospital grounds.

113.    When Pfizer's Kano Trovan Test  team arrived at IDH, they were provided with control over two of IDH's wards to conduct the Kano Trovan Test. Pfizer was also provided with use of the hospital's nurses and doctors.

114.    Pfizer's Kano Trovan Test team utilized a Nigerian nurse from the Kano area, Mahmoud Hassan.  Hassan worked with the Pfizer doctors on-site who conducted the test.

115.    Pfizer selected patients between one and thirteen years of age from among the children seeking help at the hospital to participate in the Kano Trovan Test.  Pfizer chose patients who came to the hospital with neck stiffness, joint stiffness and/or high fever with headache.

116.    Plaintiffs and the other patients who received treatment from Pfizer interacted with Mahmoud Hassan, who spoke both English and Hausa, the local language.  Mahmoud Hassan was the only member of the Pfizer team who spoke Hausa, and thus the only member of the Pfizer team who was capable of communicating with the children who were chosen for the Kano Trovan Test and their families, most of whom spoke no English.

- 43 -