provide Sunusi Alh. Ibrahim or his parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Sunusi Alh. Ibrahim and his family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

193. Neither Sunusi Alh. Ibrahim nor his parents, including his father Alhaji Ibrahim Haruna, were informed that Pfizer was offering experimental treatment or consented to such treatment. Sunusi Alh. Ibrahim became blind and partially paralyzed after his treatment. These conditions are permanent. Sunusi Alh. Ibrahim received no follow-up treatment from the Pfizer team.

194. Maryam Idris was an infant in or about April 1996 when she was brought by her parents to the IDH hospital to seek treatment for a high fever. While waiting for treatment, Maryam was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Maryam Idris was separated from her parents and enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Maryam Idris was treated by medical personnel acting under the direction of Pfizer. Upon information and belief, Pfizer did not conduct sufficient testing on Maryam Idris to accurately diagnose her with bacterial meningitis. Pfizer did not provide Maryam Idris or her parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Maryam Idris and her family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

195. Neither Maryam Idris nor her parents, including her father Malam Idris, were informed that Pfizer was offering experimental treatment or consented to such treatment. Maryam Idris

- 69 -

became deaf, mute and partially paralyzed after her treatment. These conditions are permanent.

Maryam Idris received no follow-up treatment from the Pfizer team.

196.    Yusif Idris was 2 years old in or about April 1996 when he was brought to IDH for treatment of a high fever. While waiting for treatment, Yusif was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Yusif Idris was separated from his parents and enrolled by Pfizer in the Kano Trovan Test without his family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on plaintiff Idris to accurately diagnose him with bacterial meningitis. Idris was treated for three days at IDH. Pfizer did not provide Yusif Idris or his parents with basic information, in oral or written form, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Yusif Idris and his family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

197.    Neither Yusif Idris nor his parents, including his father Umar Idris, were informed that Pfizer was offering experimental treatment or consented to such treatment. Within a week of receiving treatment from Pfizer, Yusif Idris became deaf and mute. These conditions are permanent. Plaintiff Idris received no follow-up care from Pfizer.

198.    Hafsat Isa was 3 years old in or about April 1996, when she was taken to IDH by her parents for treatment of a high fever. While waiting for treatment, Hafsat was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Hafsat Isa was separated from her parents and was enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Hafsat Isa to accurately diagnose her with bacterial meningitis. Pfizer did not provide Isa or her parents with basic

- 70 -

information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Hafsat Isa and her family were not inf...

202.    Hadiza Isyaku was an infant in or about April 1996 when she was brought by her parents to the IDH hospital to seek treatment for a high fever. While waiting for treatment, Hadiza was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Isyaku was separated from her parents and enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Isyaku to accurately diagnose her with bacterial meningitis. Pfizer did not provide Isyaku or her parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Isyaku and her family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

203.    Neither Isyaku nor her parents, including her father Isyaku Shuaibu, were informed that Pfizer was offering experimental treatment or consented to such treatment. Pfizer provided Isyaku with two weeks worth of oral medication. Two weeks following her first treatment, Hadiza Isyaku lost the ability to move her left hand and leg, lost her hearing and sight, and became brain damaged. While there has been some improvement in her condition, she remains permanently brain damaged.

204.    Zahra'u Jafaru was an infant in or about April 1996 when she was brought by her parents to the IDH hospital to seek treatment for a high fever. While waiting for treatment, Zahra'u was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Zahra'u Jafaru was separated from her parents and enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Jafaru to accurately diagnose her with bacterial meningitis. Pfizer did not provide Zahra'u Jafaru

- 72 -

or her parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Zahra'u Jafaru and her family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

205. Neither Zahra'u Jafaru nor her parents, including her father Jafaru Baba, were informed that Pfizer was offering experimental treatment or consented to such treatment. Zahra'u Jafaru became deaf and mute after her treatment. These conditions are permanent. Zahra'u Jafaru received no follow-up treatment from the Pfizer team.

206. Anas Mohammed was an infant in or about April 1996 when he was brought by his parents to the IDH hospital to seek treatment for a high fever. While waiting for treatment, Anas was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Anas Mohammed was separated from his parents and enrolled in the Kano Trovan Test without his family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Anas Mohammed to accurately diagnose him with bacterial meningitis. Pfizer did not provide Anas Mohammed or his parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Anas Mohammed and his family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

207. Neither Anas Mohammed nor his parents, including his father Malam Mohammed, were informed that Pfizer was offering experimental treatment or consented to such treatment. Anas Mohammed became partially paralyzed after his treatment. This condition is permanent. Anas Mohammed received no follow-up treatment from the Pfizer team.

- 73 -

Nafisatu Muhammed was 3 years old in or about April 1996 when she was brought by her parents to IDH hospital for treatment of a fever. While waiting for treatment, Nafisatu was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Nafisatu Muhammed was separated from her parents and was enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Muhammed to accurately diagnose her with bacterial meningitis. Pfizer did not provide Muhammed or her parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent to participation in the experiment. Muhammed and her family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

209. Neither Nafisatu Muhammed nor her parents, including her father Yahawasu Muhammed, were informed that Pfizer was offering experimental treatment, nor did they consent to such treatment. Nafisatu Muhammed became deaf and mute after her treatment. These conditions are permanent. Nafisatu Muhammed received no follow-up treatment from the Pfizer team.

210. Asma'u Mustapha was 6 years old in or about April 1996, when she was brought by her parents to IDH hospital for treatment of a fever. While waiting for treatment, Asma'u was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Asma'u was separated from her parents and was enrolled by Pfizer in the Kano Trovan Test without her family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Asma'u to accurately diagnose her with bacterial meningitis. Pfizer did not provide Asma'u or her parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent to participation in the experiment. Asma'u and her family

- 74 -

were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

211.    Neither Asma'u nor her parents, including her father Alhaji Mustapha, were informed that Pfizer was offering experimental treatment, nor did they consent to such treatment. Asma'u received no follow-up treatment from the Pfizer team. While Asma'u apparently recovered subsequent to her participation in the Kano Trovan Test, she may nonetheless have sustained serious physical injuries therefrom as Trovan has been shown to cause arthritis and liver damage in children. However, the existence of such conditions cannot be diagnosed without expensive medical testing which is unavailable to Asma'u. Further, the information as to whether Trovan or ceftriaxone, the study's control, was administered to Asma'u during the Kano Trovan Test is solely in Pfizer's possession.

212.    Muhsinu Tijjani was an infant in or about April 1996 when he was brought by his parents to the IDH hospital to seek treatment for a high fever. While waiting for treatment, Muhsinu Tijjani was chosen for the Kano Trovan Test by Pfizer from among the people seeking care at IDH. Muhsinu Tijjani was separated from his parents and enrolled by Pfizer in the Kano Trovan Test without his family's consent or knowledge. Upon information and belief, Pfizer did not conduct sufficient testing on Muhsinu Tijjani to accurately diagnose him with bacterial meningitis. Pfizer did not provide Muhsinu Tijjani or his parents with basic information, either through a written consent form or orally, about the Kano Trovan Test, or seek their informed consent for participation in the experiment. Muhsinu Tijjani and his family were not informed that safe and effective alternative treatments were available at IDH, without charge, through MSF.

- 75 -

213.    Neither Muhsinu Tijjani nor his parents, including his father Tijjani Hassan, were informed that Pfizer was offering experimental treatment or consented to such treatment. Muhsinu Tijjani became partially paralyzed after his treatment. This condition is permanent. Muhsinu Tijjani received no follow-up treatment from the Pfizer team.

214.    Each of the plaintiffs who were subjects of the Kano Trovan Test and received Trovan may be suffering from undiagnosed liver damage and/or joint damage, which has been associated with Trovan. Pfizer did not perform an initial liver screen before administering Trovan, nor did it do liver monitoring tests to ensure that patients' livers were not damaged. The tests to determine the extent of each patients' liver injury are not widely or generally available in Nigeria. Furthermore, Pfizer did not conduct MRI or orthopedic examinations to test for joint damage in the patients administered Trovan. These tests also are not widely or generally available in Nigeria. Rather, Pfizer ignored or mischaracterized as non-adverse events the evidence of joint pain and damage that was clearly present in the Kano Trovan Test data.

215.    In addition, Plaintiffs who were subjects of the Kano Trovan Test and received improperly administered and/or inadequate dosages of ceftriaxone suffered consequences of an illness that otherwise would not have occurred.

## VII.    TIMELINE OF REGULATORY ACTION CONCERNING TROVAN

216.    On December 30, 1996, Pfizer filed an application with the FDA seeking approval to market Trovan in the United States for a variety of uses, including the treatment of infectious disease in children.

217.    In or about June of 1997, FDA inspectors at Pfizer's Groton, Connecticut facility discovered nearly four dozen inconsistencies in Pfizer's data from the Kano, Nigeria experiment.

Pfizer thereafter withdrew its application to use the drug against "epidemic meningitis," after regulators indicated they would deny it based on a range of concerns -- including the failure to conduct adequate follow-up exams.

218.    Trovan was launched in February 1998 after receiving FDA authorization for a number of adult illnesses on December 17, 1997.

219.    Soon after Trovan was approved, Pfizer and the FDA began to receive reports of Trovan patients suffering from liver damage.

220.    In June 1999, the European Union's Committee for Proprietary Medicinal Products suspended all sales of Trovan for one year, a ban which was later extended.

221.    Despite these reports, Pfizer continued to seek to market Trovan to children and in 1998 and 1999 was conducting tests of Trovan against bacterial meningitis in U.S. children, using in part the knowledge concerning the drug's toxicity in pediatric patients gained from the Kano Trovan Test.

222.    The European Union has refused to allow Trovan to be marketed to children, in part based on the findings of the Kano Trovan Test.

223.    In January 1999, the FDA recommended that Trovan be prescribed only to patients in nursing homes or hospital settings suffering from life threatening conditions.

224.    On June 9, 1999, the FDA issued a public health advisory on liver toxicity associated with Trovan and Trovan-IV (the intravenous formulation of the drug) following post-marketing reports of acute liver failure strongly associated with the drug. The FDA informed physicians that Trovan should be reserved for use only in patients who meet three specific criteria, and that Pfizer had agreed to limit distribution of Trovan to hospitals and long term care nursing facilities.

- 77 -

225.    The FDA advisory noted that the agency "had received reports of over 100 cases of clinically symptomatic liver toxicity in patients receiving Trovan.  Some of the patients developed serious liver injury leading to liver transplant and/or death."  The advisory also stated that "Trovan-associated liver failure appears to be unpredictable and has been associated with as little as two days exposure."

226.    The FDA action effectively pulled Trovan from general pharmacy shelves and restricted doctors to using Trovan in only emergency situations where the need to combat a serious, life-threatening infection outweighs any liver risk.

## VIII.    FRAUDULENT CONCEALMENT /TOLLING OF THE STATUTE OF LIMITATIONS

227.    Defendant concealed from plaintiffs the relevant facts concerning the 1996 Kano Trovan Test.  As described above, plaintiffs were unaware that their children and charges were subjects of an experimental Trovan trial and signed no consent forms related to that trial.  Plaintiffs did not know, and could not have discovered, that they had participated in a biomedical research experiment until December 2000, when Nigerian newspapers reported the facts of the experiment first exposed by a December 17, 2000 article in The Washington Post written by Joe Stephens.

## IX.    CLAIMS

### First Claim for Relief Under International Law
### Failure to Obtain Informed Consent

228.    Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

229.    International Law as evidenced by, *inter alia*, the Nuremberg Code, the Declaration of Helsinki,  article 7 of the ICCPR, and the CIOMS Guidelines requires that medical researchers receive informed consent.

230.    Defendant Pfizer did not secure plaintiffs' informed consent or in fact <u>any</u> consent prior to enrolling the plaintiff children in its test of Trovan.

231.    As  a result of defendant's actions, the children enrolled in the Kano Trovan Test and their parents suffered damages, including the right to withhold consent, the children's deafness, blindness, paralysis, mental and physical suffering and death, and the parents' mental suffering, cost of care and loss of services.

### Second Claim for Relief Under International Law
### Breach of Duty to Provide the Best Proven Diagnostic
### and Therapeutic Methods

232.    Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

233.    International Law as evidenced by, *inter alia*, the Nuremberg Code, the Declaration of Helsinki, and the CIOMS Guidelines requires that medical researchers provide the best proven diagnostic and therapeutic methods.

234.    Defendant breached this duty by failing to properly diagnose patients as suffering from bacterial meningitis through the use of CFS analyses, which is the internationally accepted method for diagnosing meningitis.

235.    Defendant also breached this duty by abandoning efforts to test patients' blood as planned.

- 79 -

236.    Defendant also breached this duty by giving Trovan to critically-ill Nigerian children, despite the availability of alternative, safer drugs.

237.    Defendant also breached this duty by failing to alter the therapy provided to children who did not respond to treatment provided in the experiment and by failing to use alternative treatments for such children.

238.    Defendant also breached this duty by purposefully low dosing (administering one-third of the recommended dosage) ceftriaxone to patients in the control group.

239.    Defendant also breached this duty by failing to provide adequate follow-up care to patients enrolled in its experiment and by improperly injecting the control drug.

240.    Defendant's above-referenced actions caused the children enrolled in the Kano Trovan Test and their parents to suffer damages, including the children's deafness, blindness, paralysis, physical and mental suffering, and death, and the parents' mental suffering, cost of care and loss of services.

### Third Claim for Relief Under International Law
### Breach of Duty to Treat with Dignity

241.    Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

242.    International Law as evidenced by, *inter alia*, the Nuremberg Code and Helsinki Declaration recognizes the right of every human subject to be treated with dignity in the conduct of a clinical trial.

- 80 -

243. Defendant's conduct during the Kano Trovan Test as set forth herein, breached plaintiffs' right to be treated with dignity as set forth in the Nuremberg Code and Declaration of Helsinki.

244. Defendant's actions caused the children enrolled in the Kano Trovan Test and their parents to suffer damages, including the children's deafness, blindness, paralysis, physical and mental suffering, and death, and the parents' mental suffering, cost of care and loss of services.

### Fourth Claim for Relief Under International Law
### Breach of Right to be Free from Cruel, Inhuman
### and Degrading Treatment

245. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

246. International Law as evidenced by, *inter alia*, art. 7 of the ICCPR considers medical testing without informed consent as torture or cruel or inhuman punishment which is forbidden under International Law as evidenced by art. 5 of the Universal Declaration of Human Rights.

247. As described herein, Defendant conducted the Kano Trovan Test without seeking plaintiffs' informed consent, or in fact any consent from the children enrolled and/or their parents or guardians. Plaintiffs were not informed the "treatment" provided to the children enrolled in the Kano Trovan Test was experimental in nature. Nevertheless, Pfizer enrolled the children in the Kano Trovan Test.

248. Defendant's conduct constituted torture or cruel or inhuman punishment in violation of the law of nations.

- 81 -

257.    Plaintiffs are entitled to punitive damages in that the test violated international law, federal law and medical ethical standards, but the Company took no corrective action.

258.    Plaintiffs are further entitled to punitive damages because Pfizer chose as its victims sick and impoverished Nigerian children who were particularly vulnerable and thus deserving of special care and protection.

259.    Pfizer, as the world's largest pharmaceutical company, with revenues of $16.2 billion in 1999, will not be deterred in the future from the type of conduct complained of herein unless very substantial punitive damages are imposed.

**WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:**

a.    Award plaintiffs compensation arising from their nonconsensual involvement in the Kano Trovan Test;

b.    An Order requiring defendant to pay punitive damages;

c.    An Order requiring defendant to provide ongoing medical care to evaluate the liver and joint function of the children enrolled in the experiment and requiring defendants to treat any abnormalities so detected;

d.    An Order enjoining defendant from conducting illegal human experimentation anywhere in the world;

e.    Attorneys' fees, expenses, and costs of this action; and

f.    Such further relief as this Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury in this action.

Dated: August 28, 2001

- 83 -

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956 (S.D.N.Y.))

▶

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Rabi ABDULLAHI, individually and as the natural
guardian and personal
representative of the estate of her daughter
Lubabatau Abdullahi, et al,
Plaintiffs,
v.
PFIZER, INC., Defendant.

No. 01 CIV. 8118.

Sept. 17, 2002.

Aliens who allegedly received an experimental antibiotic sued the company which administered the antibiotic, alleging violations of the law of nations as it was advised by the Nuremberg Code, the Declaration of Helsinki, the International Covenant on Civil and Political Rights (ICCPR), and customary international law. On the company's motions to dismiss for failure to state a claim, and to dismiss for forum non conveniens, the District Court, William H. Pauley III, J., held that: (1) company's alleged conduct was not a violation of "universal concern," for which a private actor could be held liable; (2) complaint adequately alleged that the company was a "state actor" to state a claim under the Alien Tort Claims Act; but (3) action would be conditionally dismissed for forum non conveniens in favor of Nigeria as a preferred forum.

Ordered accordingly.

[1] International Law ⚖10.11

221k10.11

Company's administration of an experimental antibiotic to aliens, allegedly resulting in grave injuries, did not constitute a violation of "universal concern," within the meaning of the section of the Restatement (Third) of Foreign Relations Law specifying international law violations for which a private actor could be held liable. Restatement (Third) of Foreign Relations Law § 404.

[2] International Law ⚖10.11
221k10.11

Aliens who allegedly received an experimental antibiotic resulting in grave injuries adequately alleged that the company which administered the antibiotic was a "state actor," due to the joint participation of the Nigerian government, and thus stated a claim for violation of the law of nations cognizable under the Alien Tort Claims Act; the complaint alleged that the Nigerian government, inter alia, provided a letter of request to the Food and Drug Administration (FDA) to authorize the export of the antibiotic, assigned Nigerian physicians to work with the company, and acted to silence Nigerian physicians critical of the company's tests. 28 U.S.C.A. § 1350.

[3] Federal Courts ⚖45
170Bk45

Alien Tort Claims Act suit brought by Nigerians, who allegedly received an experimental antibiotic resulting in grave injuries, against the company which administered the antibiotic would be conditionally dismissed for forum non conveniens in favor of Nigeria as a preferred forum, despite claim that Nigerian courts were not sufficiently independent and impartial; the submissions did not reach beyond general characterizations or allege corruption of the Nigerian judicial process on the part of the company, and moreover, the Nigerians had no significant ties to the district, their claims were asserted under international law, and evidence of numerous elements of their claims would be more accessible in a Nigerian forum. 28 U.S.C.A. § 1350.

Brad N. Friedman, Esq., Milberg Weiss Bershad Hynes & Lerach, New York, for Plaintiffs.

James D. Herschlein, Esq., Kaye Scholer LLP, New York, for Defendant.

MEMORANDUM AND ORDER

PAULEY, District J.

*1 In this putative class action, plaintiffs allege that they suffered grave injuries from an experimental antibiotic administered by defendant Pfizer Inc. ("Pfizer") without their informed consent. Plaintiffs allege violations of the law of nations as it is advised by the Nuremberg Code, the Declaration of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956, *1 (S.D.N.Y.))

Helsinki, the International Covenant on Civil and Political Rights (the "ICCPR") and customary international law. Pfizer moves to dismiss the complaint for forum non conveniens and failure to state a claim.

For the following reasons, defendant's motion to dismiss the complaint for failure to state a claim is denied and defendant's motion to dismiss the complaint for forum non conveniens is granted.

Background

The facts below are taken from plaintiffs' eighty-three-page complaint and are adopted only for the purposes of this motion. Pfizer is the world's largest pharmaceutical company. (Compl.¶ 4.) Plaintiffs are Nigerian minors and their guardians, all of whom are residents of Nigeria. (Compl.¶¶ 16-50, 115.)

In the mid-1990's, Pfizer developed Trovaflozacin Mesylate, an antibiotic that is also known by its brand name as "Trovan." Pfizer projected that its total annual sales could exceed $1 billion a year. (Compl.¶ 96.) Beginning in 1996, Pfizer conducted the largest drug testing program ever undertaken by enrolling thousands of subjects in clinical tests. (Compl.¶ 97.) However, prior animal testing indicated that Trovan might cause significant side effects in children such as joint disease, abnormal cartilage growth (osteochondiosis, a disease resulting in bone deformation) and liver damage. (Compl.¶¶ 98-99.)

In 1996, epidemics of bacterial meningitis, measles and cholera besieged the impoverished Nigerian city of Kano. (Compl.¶¶ 2, 5, 101.) In April 1996, six weeks after it first learned of the epidemics, Pfizer dispatched a medical team to establish a treatment center at Kano's Infectious Disease Hospital ("IDH"). (Compl.¶¶ 2, 8, 101-02, 101-07, 109.)

In addition to Pfizer's team, humanitarian organizations such as Medecins Sans Frontieres ("MSF"), also known as Doctors Without Borders, traveled to Kano's IDH to treat the sick. (Compl.¶ 5.) The medical teams operated under squalid conditions in a hospital comprised of several single story cinder block buildings, some of which lacked electricity and running water. (Compl.¶ 110.) The beds were filled to capacity and patients seeking care overflowed on to the hospital's grounds.

(Compl.¶ 110.) Plaintiffs allege that while MSF and other organizations offered safe and effective treatments for bacterial meningitis, Pfizer embarked on a medical experiment involving the "new, untested and unproven" antibiotic "Trovan." (Compl.¶¶ 2-3, 6, 8, 95.)

To travel to Kano, Pfizer needed the U.S. Food and Drug Administration's ("FDA") authorization to export Trovan. On March 15, 1996, Pfizer informed the FDA of its intent to conduct the Kano study. (Compl.¶ 108.) Thereafter, Pfizer obtained a March 20th letter from the Nigerian government and a March 28th letter from IDH's ethics committee permitting Pfizer to export Trovan to Kano. (Compl. ¶ 108.) Although both letters predate Pfizer's departure for Kano, plaintiffs allege that no IDH ethics committee existed as of March 28, 1996 and that the March 28th letter was back-dated in response to a 1997 FDA audit. (Compl.¶¶ 132-33.)

*2 Plaintiffs further contend that Pfizer's sole purpose for traveling to Kano was to expedite the FDA's approval of Trovan to treat pediatric victims. (Compl.¶ 7.) Prior to Kano, only one child had ever been treated with Trovan, and then only after all other antibiotics failed. No child had ever received it orally. (Compl.¶ 105-06.) According to plaintiffs, Nigerian officials allocated to Pfizer two of IDH's wards to conduct the testing. (Compl.¶ 113.) Pfizer selected, from lines of those awaiting treatment, children ranging in age from one to thirteen years who exhibited symptoms of neck stiffness, joint stiffness, and high fevers with headaches. (Compl.¶ 3, 115.) Pfizer divided them into two groups and treated half with Trovan. (Compl.¶ 3.) The other half was "purposefully 'low-dosed' " with ceftriaxone, an FDA-approved drug shown to be effective in treating meningitis. (Compl.¶ 125.) In order to enhance the comparative results of Trovan, Pfizer administered only one-third of ceftriaxone's recommended dosage. (Compl.¶¶ 3, 124-25.)

Meanwhile, MSF established their headquarters in tents beside the IDH due to space constraints. (Compl.¶ 111.) There, MSF admitted their sickest patients to hospital beds in the IDH and confined the less ill to floor mats in their tents. (Compl.¶ 112.) MSF treated pediatric meningitis patients with chloramphenicol, a drug recommended by the World Health Organization to treat bacterial meningitis in epidemic situations. (Compl.¶¶ 11, 111.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956, *2 (S.D.N.Y.))

Pfizer's protocol also called for the children selected to have their blood tested on arrival and five days later. (Compl.¶ 126.) If a child was not responding well to Trovan, Pfizer switched his or her treatment to ceftriaxone. (Compl.¶ 126.) Plaintiffs allege, however, that Pfizer neglected to analyze the patients' blood samples and therefore could not determine if a patient had a negative reaction until the manifestation of a visible and permanent injury. (Compl.¶ 126.) Plaintiffs further allege that low-dosing ceftriaxone resulted in injuries and deaths among the control group. (Compl.¶ 3.)

Although Pfizer's protocol called for its team to obtain consent from the parents of the children treated who were too young to sign, few parents could speak or read English. (Compl.¶ 127.) Plaintiffs claim that Pfizer failed to explain to the children's parents that the proposed treatment was experimental, that they could refuse it, or that other organizations offered more conventional treatments at the same site free of charge. (Compl.¶¶ 3, 117-20, 128-30, 154-55, 157.) After two weeks, Pfizer's team left Kano and never returned for follow-up evaluations. (Compl.¶ 122.) Plaintiffs allege that five children who received Trovan and six children whom Pfizer "low-dosed" died. (Compl.¶ 120.) Others suffered paralysis, deafness and blindness. (Compl.¶¶ 16- 50.)

On December 30, 1996, Pfizer applied with the FDA for approval to market Trovan in the United States for various uses including the treatment of pediatric infectious diseases. (Compl.¶ 216.) In June 1997, FDA inspectors discovered inconsistencies in the data resulting from Pfizer's Kano treatments. (Compl.¶ 217.) Thereafter, regulators informed Pfizer that they planned to deny its application to use the drug against epidemic meningitis and expressed several concerns including Pfizer's failure to conduct follow-up examinations. In response, Pfizer withdrew its application. (Compl.¶ 217.)

*3 On February 18, 1998, Pfizer launched Trovan after it received FDA authorization for treatment of a number of adult illnesses. (Compl.¶ 218.) Shortly thereafter, Pfizer and the FDA received reports regarding Trovan patients suffering liver damage. (Compl.¶ 219.)

In January 1999, the FDA recommended that Trovan be prescribed only for patients in nursing homes or hospitals suffering from life threatening conditions. (Compl.¶ 223.) That following June, the FDA issued a public health advisory on liver toxicity associated with oral and intravenous Trovan following post-marketing reports of acute liver failure strongly associated with the drug. (Compl.¶ 224.) The FDA announced that it received reports of more than one-hundred cases where Trovan patients exhibited clinically symptomatic liver toxicity and advised physicians to use Trovan only for patients who met certain criteria. (Compl.¶ 224-25.) In addition, Pfizer agreed to limit distribution of Trovan to hospitals and long term nursing facilities. (Compl.¶ 224.) Further, the European Union's Committee for Proprietary Medicinal Products suspended all sales of Trovan in part due to results from the Kano tests. (Compl.¶¶ 221-22.)

On August 29, 2001, plaintiffs brought this action pursuant to the Alien Tort Claims Act to recover damages for Pfizer's violations of international law, as set forth in the Nuremberg Code, the Declaration of Helsinki, article 7 of the ICCPR, FDA regulations and "other norms of international law." (Compl.¶ 15, 134.) Specifically, plaintiffs allege that Pfizer treated them with the knowledge that Trovan had the potential to cause serious joint and liver damage, failed to inform them of that risk or seek their informed consent, and neglected to evaluate the subjects subsequent to their treatment. (Compl.¶¶ 135-40.)

Discussion

I. *Rule 12(b)(6) Standards*

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. *See Wright v. Giuliani,* No. 99 Civ. 10091(WHP), 2000 WL 777940, at *4 (S.D.N.Y. June 14, 2000).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

(Cite as: 2002 WL 31082956, *3 (S.D.N.Y.))

Page 4

## II. *The Alien Tort Claims Act*

Pfizer asserts that plaintiffs' complaint fails to plead a violation of the law of nations because they "rely on a single treaty," the ICCPR, which provides no private right of action. (Def .'s Mem. in Opp. at 10-11.) As a non- self-executing treaty, the ICCPR does not give rise to a private cause of action. *Dreyfus v. Vonfinck,* 534 F.2d 24 (2d Cir.1976) (without implementing legislation, the ICCPR cannot give rise to a private cause of action). Plaintiffs, however, allege that Pfizer violated customary international law, otherwise known as the "law of nations," and assert jurisdiction pursuant to the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350. (Pls. Mem. in Opp. at 6; see also Compl. ¶ 51 (alleging violations of the "fundamental principles of a civilized society that constitute binding norms on the community of nations").) The ATCA provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Here, there is no dispute that plaintiffs are aliens alleging cognizable tort causes of action. Thus, for federal subject-matter jurisdiction to exist under the ATCA, the complaint must adequately plead a violation of international law. *See Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995) (quoting *Filartiga v. Pena-Irala,* 630 F.2d 876, 887-88 (2d Cir.1980)) ("Because the [ATCA] requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of section 1331 [federal question jurisdiction]."); *see also Bigio v. Coca-Cola Co.,* 239 F.3d 440, 447 (2d Cir.2000) (under the ATCA pleading a violation of the law of nations is a jurisdictional prerequisite).

**\*4** The law of nations "results from a general and consistent practice of states which is followed by them from a sense of legal obligation." Restatement (Third) of Foreign Relations Law § 102(2)(1987); *see also Jama v. INS,* 22 F.Supp.2d 353, 362 (D.N.J.1998). "The law of nations 'may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." ' *Filartiga,* 630 F.2d at 880 (citing United States v.

Smith, 5 Wheat. 153, 18 U.S. 153, 160-61, 5 L.Ed. 57 (1820)). Non-self executing agreements like the ICCPR may evidence the binding principles of international law. *See United States v. Toscanino,* 500 F.2d 267, 275-76 (2d Cir.1974) (U.N. Charter and the Charter of the Organization of American States demonstrated that kidnapping a criminal defendant from a country with formal extradition procedures violated international law). Thus, while plaintiffs need not rely on the ICCPR to provide a private right of action, they may look to that treaty to allege that "[Pfizer's] conduct violate [d] 'well-established, universally recognized norms of established international law." ' *Kadic,* 70 F.3d at 239 (citing *Filartiga,* 630 F.2d at 881, 888); *see also Alvarez-Machain v. United States,* 266 F.3d 1045, 1050 (9th Cir.2001) (international law is comprised of societal norms that are "specific, universal, and obligatory").

Here, plaintiffs rely on article 7 of the ICCPR, as well as the Nuremberg Code, the Declaration of Helsinki, FDA regulations and "other norms of international law" to frame their complaint. (Compl. ¶¶ 15, 134.) Thus, this Court has jurisdiction over this action so long as plaintiffs can allege an international law violation as evidenced by principles of those agreements and regulations.

## III. *International Law Violations*

Pfizer contends that plaintiffs' complaint fails to state a claim because its alleged misconduct does not qualify as one of the exceptions where a private party can be held liable for a "law of nations" violation and it was not a "state actor." (Def.'s Mem. in Supp. at 14-15.)

### A. *Private Actor Violations*

[1] "[C]ertain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Kadic,* 70 F.3d at 239-40; *see also* Restatement (Third) § 404 ("Individuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide.").

"[T]he Restatement is careful to identify those violations that are actionable when committed by a state, and a more limited category of violations of 'universal concern' ' for which a private actor may

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956, *4 (S.D.N.Y.))

be held accountable. *Kadic,* 70 F.3d at 240. According to section 404 of the Restatement, private parties may be liable under international law for violations "such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." In comparison, section 702 provides that "[a] state violates international law if, as a matter of state policy, it practices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, or (g) a consistent pattern of gross violations of internationally recognized human rights." While the categories of state and private actor violations may overlap, they are not coextensive. *Kadic,* 70 F.3d at 240. Thus, courts should find that an international law violation exists for private actors when the particular misconduct "is either listed as an act 'of universal concern' in [section] 404 or is sufficiently similar to the listed acts for us to treat them as though they were incorporated into [section] 404 by analogy." *Bigio,* 239 F.3d at 448.

**\*5** In *Kadic,* the Second Circuit found that "torture and summary execution--when not perpetrated in the course of genocide or war crimes--is proscribed by international law only when committed by state officials or under color of law." *Kadic,* 70 F.3d at 243; *see also Bigio,* 239 F.3d at 448 (religious and racial discrimination are not international law violations when committed by a private actor). In comparison, the conduct alleged here, however reprehensible, falls short of constituting a section 404 violation of "universal concern." Thus, the conduct alleged in the complaint does not constitute an international law violation for which a private party may be held liable, and plaintiffs cannot state a claim under the law of nations against Pfizer unless they adequately allege that Pfizer acted as a state actor. [FN1]

FN1. While Pfizer disputes that it committed the alleged misconduct that plaintiffs claim constitutes a section 702 violation, it does not move to dismiss the complaint on the ground that plaintiffs have not adequately plead conduct that could constitute a section 702 violation. (Tr. of Oral Argument, dated Apr. 19, 2002, at 9-10.)

B. *State Actor Violations*

[2] Pfizer contends that plaintiffs cannot state a claim for a section 702 violation because it was a private actor. Plaintiffs respond that Pfizer acted as a *de facto* state actor because it conducted the Trovan study with the assistance of the Nigerian government and government employees from the IDH and the Aminu Teaching Hospital. (Pls. Mem. in Opp. at 15-16.)

In considering allegations of international law violations against a private actor accused of acting under color of law, courts may use 42 U.S.C. § 1983 jurisprudence to determine "whether a defendant has engaged in official action for purposes of jurisdiction under the [ATCA]." *See Kadic,* 70 F.3d at 245.

Under section 1983 jurisprudence, private activity can become actionable misconduct under international law when the government "has so far insinuated itself into a position of interdependence with [the private actor] that [they] must be recognized as a joint participant[s] in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *see also Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (requiring a nexus "sufficiently close" so that the state's exercise of "coercive power" or providing of "significant encouragement, either overt or covert" necessitates that the private actor's choice "must in law be deemed to be that of the State"); *National Coalition of the Gov't of the Union of Burma v. Unocal,* 176 F.R.D. 329, 346 (9th Cir.1997) (joint action exists where "a private party is a willful participant in a joint action with the State of its agents"); *Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1081 (2d Cir.1990) (private conduct constitutes a state action when the state has insinuated itself into a position of interdependence with the private party so that it must be recognized as a joint participant in the challenged activity). The relationship between state and private actors must be sufficiently close "so that the action of the [private actor] may be fairly treated as that of the State itself." *Blum,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534; *accord Unocal,* 176 F.R.D. at 347 (private person is liable only if "the particular actions challenged are inextricably intertwined with those of the government").

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956, *5 (S.D.N.Y.))

**\*6** Pfizer asserts that plaintiffs do not adequately allege that the Nigerian government was involved in the specific misconduct. The complaint, however, alleges that the Nigerian government acted in concert with Pfizer by providing a letter of request to the FDA to authorize the export of Trovan, arranging for Pfizer's accommodation in Kano's IDH, assigning Nigerian physicians to work with Pfizer, back-dating an "approval letter" that international protocol required be ascertained prior to the test, and acting to silence the Nigerian physicians critical of the company's test. (Compl.¶ 108. n. 6.) Those assertions sufficiently allege that the former Nigerian government and Pfizer were joint participants in the Trovan treatment. *Unocal,* 176 F.R.D. at 345 ("[T]he state action inquiry is more easily resolved on summary judgment than on a motion to dismiss because the court must review the facts and circumstances surrounding the challenged action in their totality.").

### IV. *Forum Non Conveniens*

[3] Pfizer further contends that this Court should dismiss the complaint on the grounds of forum non conveniens because Nigeria is a preferred forum for this dispute. (Def.'s Mem. in Supp. at 21-22.) "Forum non conveniens is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." ' *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir.2000) (citing *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998)). Dismissal is usually not appropriate unless "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991).

Dismissal pursuant to forum non conveniens requires a defendant to demonstrate that an adequate alternative forum exists. *Peregrine Myanmar Ltd. V. Segal,* 89 F.3d 41, 46 (2d Cir.1996); *see also Calavo Growers of Calif. v. Generali Belgium,* 632 F.2d 963, 968 (2d Cir.1980) (*forum non conveniens* "presupposes that an alternative forum is available"). If an adequate forum is available, the court then considers the public and private interest factors set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and its progeny. *See Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir.2002); *Wiwa,* 226 F.3d at 100. From those factors, the Court must determine whether a trial in the plaintiffs' chosen forum would either create "oppressiveness and vexation for the defendants out of proportion to plaintiffs' convenience, or be inappropriate because of " 'considerations affecting the court's own administrative and legal problems." ' *Piper Aircraft v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citing *Koster v. (American) Lumbermens Mut. Casualty Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)).

### A. *Adequate Alternative Forum*

Pfizer asserts that Kano's Federal High Court is an adequate alternate forum for plaintiffs' claims. (Def.'s Mem. in Supp. at 21.) Plaintiffs contend that Pfizer fails to meet its burden of demonstrating that Kano's Federal High Court is an adequate forum with "adequate procedural safeguards" with the "modicum of independence and impartiality necessary to ensure that the remedy available in the alternative forum [is not] so inadequate to amount to no recovery at all." (Pls.' Mem. in Opp. at 29.)

**\*7** Usually, an alternative forum is adequate if the defendants are subject to service of process there and the forum permits litigation of the disputed subject matter. *Piper,* 454 U.S. at 254 n. 22; *accord Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC,* 155 F.3d 603, 608 (2d Cir.1998); *see also Gilbert* 330 U.S. at 506-07 (alternate forum is ordinarily satisfied if the defendant is "amenable to process" in the foreign forum); *Aguinda v. Texaco, Inc.,* Nos. 01-7756L, 01-7758C, 2002 WL 1880105, at \*4 (2d Cir. Aug.16, 2002). Whether the law of the foreign forum differs from American law "should ordinarily not be given conclusive or even substantial weight" in assessing the adequacy of the forum. *Piper,* 454 U.S. at 249; *accord Capital Currency Exchange, N.V.,* 155 F.3d at 608; *PT United,* 138 F.3d at 74 ("The availability of an adequate alternate forum does not depend on the existence of an identical cause of action in the other forum.").

Pfizer contends that not only is it subject to service of process in Nigeria, but it is also currently defending a lawsuit in Kano's Federal High Court filed five months prior to the instant complaint that arises from the Trovan treatment. In addition, Pfizer

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

consent to jurisdiction in Kano's Federal High Court. (Def.'s Mem. in Supp. at 21.) Thus, Pfizer is subject to service of process in Nigeria. *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 57 (2d Cir.2000); ("An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy this requirement.") vacated on other grounds by *DiRienzo v. Philip Servs. Corp.,* 294 F.3d 321 (2d Cir.2002); *accord Aguinda,* 2002 WL 1880105, at *4; *Albert Trading, Inc. v. Kipling Belgium N.V./S.A.,* No. 00 Civ. 0478(RMB), 2002 WL 272408, (S.D.N.Y. Feb.26, 2002).

Pfizer further argues that Nigerian law provides an adequate remedy for plaintiffs' claims because it recognizes negligence, medical malpractice, and personal injury claims. (Def.'s Mem. in Supp. at 21.) Plaintiffs do not dispute that Nigerian law prescribes those causes of action sounding in negligence with money damages as a potential remedy. (*See* Pls.'s Mem. in Opp. at 23-24.) Thus, Nigerian law provides an alternative basis for recovery even if it does not recognize the specific claims plaintiffs allege in this action. *See PT United,* 138 F.3d at 74 (dismissal proper although RICO claims could not be brought in alternate forum; fraud claim adequate substitute); *Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129-30 (2d Cir.1987) (same); *Howe v. Goldcorp Inv., Ltd. .,* 946 F.2d 944, 952 (1st Cir.1991) (affirming dismissal although U.S. securities law claims could not be brought in alternate forum). Instead, plaintiffs assert the "difference in substantive law is irrelevant" because Pfizer has not established that "Nigerian courts provide a 'modicum of independence and impartiality' necessary to ensure that the remedy available in the alternative forum not be so inadequate to amount to no recovery at all." (Pl.s' Mem. in Opp at 24.)

**\*8** "In rare circumstances ... where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative ...." *Piper,* 454 U.S. at 254 n. 22; *see also Eastman Kodak Vo. V. Kavlin,* 978 F.Supp. 1078, 1084 (S.D.Fla.1997) (noting that "the 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record"). Thus, a motion to relegate a plaintiff to a foreign forum will be denied if the plaintiff shows that conditions in the foreign forum plainly demonstrate that "plaintiffs are highly unlikely to obtain basic justice

thereof. *See Cabiri v. Assasie-Gyimah,* 921 F.Supp. 1189, 1199 (S.D.N.Y.1996) (citing *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854 (S.D.N.Y.1983) (denying dismissal of complaint alleging torture for forum non conveniens because of plaintiff's fear of persecution)); *see also Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1227 (3d Cir.1995) (finding that Indian forum was inadequate where delays up to twenty- five years were possible).

An analysis of whether an alternate forum is adequate, as framed by Circuit Judge Jon O. Newman while sitting by designation on the Eleventh Circuit, recognizes that

defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegations of serious corruption or delay. Thus, where the allegations are insubstantially supported, ..., a District Court may reject them without considering any evidence from the defendant. But where the plaintiff produces significant evidence documenting the partiality or delay (in years) typically associated with the adjudication of similar claims, and these conditions are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the District Court that the facts are otherwise. This approach forbids dismissal to alternative forums that realistically are not capable of producing a remedy for the plaintiff's injuries, without crediting cursory attacks on legal systems simply because they are somewhat slower or less elaborate than ours.

*Leon v. Million Air, Inc.,* 251 F.3d 1305, 1312 (11th Cir.2001); *see also PT United,* 138 F.3d at 73 ("Considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards.").

Plaintiffs attack Kano's High Court as the product of a corrupt government that is, albeit democratically elected, composed of representatives from its former military regime who continue "to hunt down political opponents and those perceived to be working against the interest of the government ...." (Aff. of Dr. Vincent O. Orlu Nmehielle, Mar. 5, 2002) ("Nmehielle Aff.") ¶¶ 8-9, 21.) According to plaintiffs' supporting affidavits, the Nigerian judicial system is "subject to influence from powerful entities, such as the executive and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31082956, *8 (S.D.N.Y.))

legislative branches of the government, [and] the wealthy," and consists of safeguards that are "generally by-passed in favor of powerful and influential parties." (Nmehielle Aff. ¶¶ 22, 24.) Plaintiffs bolster those claims with the U.S. Department of State and United Nations' reports stating that Nigeria's "judiciary remained subject to executive and legislative branch pressure, was influenced by political leaders at both the state and federal levels," and the courts are plagued by "understaffing, inefficiency, and corruption" that prevent the judiciary from functioning adequately. (Nmehielle Aff.: Ex. A, at 1, 6; Ex. B, at 2, 6, 7; Ex. C, at 6; *see also* Ex. D: Dep't of Commerce Report at 2 (criticizing the judiciary as "greatly weakened by neglect and endemic corruption"). Undoubtedly, the record offered by plaintiffs indicates that Nigeria is a nation experiencing difficulties in its transition from a dictatorship to a democracy. However, nothing in plaintiffs' submissions reaches beyond the most general of characterizations.

**\*9** This Court has a duty to exercise restraint when assessing the sufficiency of other nations' courts and legal systems. The Second Circuit has "repeatedly emphasized that '[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." ' *Blanco v. Banco Industrial de Venezuela,* 997 F.2d 974, 982 (S.D.N.Y.1993) (quoting *Chesley v. Union Carbide Corp.,* 927 F.2d 60, 66 (2d Cir.1991)); *accord Monegasqye De Reassurances S.A .M. (Monde Re), v. NAK Naftogaz of Ukraine,* 158 F.Supp.2d 377, 385 (S.D.N.Y.2001); *see also Satz v. McDonnell Douglas Corp.,* 244 F.3d 1279, 1283-84 (11th Cir.2001) ("[a]n adequate forum need not be a perfect forum").

Moreover, conclusory allegations of corruption or bias on the part of the foreign forum will not prevent a dismissal on forum non conveniens grounds. *See El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 678 (D.D.Cir.1996) (State Department report expressing "concern about the impartiality" of Jordanian courts did not suffice to make that forum inadequate); *see also Leon,* 251 F.3d at 1312 (finding that plaintiffs' affidavits documenting the shortcomings of Ecuador's legal system, including a lack of financial resources, the use of manual typewriters in 90 percent of the courts, the absence

of computers in the trial courts, and congestion and delays illustrated by case filings of one thousand lawsuits per judge and at least one commercial case that was pending for 12 years, was not sufficient to demonstrate that the alternate forum was inadequate); *Blanco,* 997 F.2d at 982 (political unrest in a foreign jurisdiction did not render the forum inadequate absent some showing that the unrest has had an adverse effect on the judicial system there.); *Gonzalez v. P.T. Pelangi Niagra Mitra Int'l,* 196 F.Supp.2d 482, 487-88 (S.D.Tex.2002) (plaintiffs' general accusations contained in "voluminous proof of corruption in the Indonesian judiciary--including newspaper articles, statements by prominent Indonesian politicians, the results of a survey conducted by the Partnership for Governance Reform in Indonesia, a World Bank report and statements by the United States government" failed to render Indonesia an inadequate forum); *Aguinda v. Texaco, Inc.,* 142 F.Supp.2d at 544 (S.D.N.Y.2001), *aff'd* 2002 WL 188015 (2d Cir. Aug. 16, 2002) (finding State Department reports containing "conclusory assertions as to the relative corruptibility or incorruptibility of Ecuadorian courts, with scant references to specifics, evidence, or application to the instant cases" to be of "little use"). Further, none of the submissions allege corruption of the Nigerian judicial process on the part of Pfizer. Compare *Aguinda,* 142 F.Supp.2d at 544 (conclusory allegations will not defeat defendant's assertion of an adequate alternate forum) *with Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1081 (S.D.Fla.1997) (employer's complaint alleging that Bolivian citizen conspired with Bolivian judge and attorney to wrongfully imprison an employee to extort a settlement from employer provided sufficient "backdrop" to employer's general assertions of corruption to overcome defendant's assertion that an adequate alternative forum existed).

**\*10** Thus, in light of Pfizer's showing that it is "amenable to process" in Nigeria, and the conclusory nature of plaintiffs' evidence regarding the inadequacy of Nigeria's legal system, this Court finds that this is not one of those "rare circumstances" where the potential difficulties of the foreign forum render the remedy offered by that forum "clearly unsatisfactory." *Piper,* 454 U.S. at 255 n. 22.

B. *Balance of Private and Public Interest Factors*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works